DAHMEN v. LIBERTY MUTUAL GROUP, et. al.

No. 2:15-cv-76-SAB

# EXHIBIT 1

1  J. Scott Miller
2  Law Offices of J. Scott Miller, P.S.
3  201 W. North River Drive, Suite 305
   Spokane, WA 99201
4  Tel 509/327-5591
5  Fax 509/328-6436
6  jscottmiller@jscottmiller.com

7

8               UNITED STATES DISTRICT COURT
9               EASTERN DISTRICT OF WASHINGTON

10

11  TIMOTHY DAHMEN, a married man,
12
13              Plaintiff,            Case No.  2:15-cv-76-SAB
14
        vs.
15
16  LIBERTY MUTUAL GROUP, INC., a     PLAINTIFF'S SECOND
17  Massachusetts corporation, and    AMENDED COMPLAINT
    LIBERTY MUTUAL INSURANCE          *(proposed)*
18  COMPANY, a Massachusetts
19  corporation and wholly owned
    subsidiary of Liberty Mutual Group,
20  and LIBERTY LIFE ASSURANCE
21  COMPANY OF BOSTON, a
    Massachusetts corporation and wholly
22  owned subsidiary of Liberty Mutual
23  Group, and LIBERTY MUTUAL
24  SHORT TERM DISABILITY PLAN, a
25  disability plan under federal ERISA
26  statutes, and LIBERTY MUTUAL
27  LONG TERM DISABILITY PLAN, a
    disability plan under federal ERISA
28  statutes,
29              Defendants.

30

Second Amended Complaint - 1

COMES NOW PLAINTIFF Timothy Dahmen by and through his attorneys and for cause of action against the defendants above named, hereby alleges, affirms, and complains as follows:

## 1. **PARTIES**

1.1. TIMOTHY DAHMEN is, and was at all times relevant to this litigation, a married man residing in Spokane County, Washington.

1.2. Defendant LIBERTY MUTUAL GROUP, INC. is, and was at all times relevant to this litigation, a Massachusetts corporation conducting business in the state of Washington, including Spokane County.

1.3. Defendant LIBERTY MUTUAL INSURANCE COMPANY is, and was at all times relevant to this litigation, a mutual insurance company organized under the laws of the state of Massachusetts conducting business in the state of Washington, including Spokane County.

    1.3.1.    Liberty Mutual Insurance Company is a subsidiary of Liberty Mutual Group, Inc.

1.4. Defendant LIBERTY LIFE ASSURANCE COMPANY OF BOSTON is, and was at all times relevant to this litigation, a Massachusetts corporation conducting business in the state of Washington, including Spokane County.

    1.4.1.    Liberty Life Assurance Company of Boston is a subsidiary of Liberty Mutual Group, Inc.

Second Amended Complaint - 2

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA 99201*
*(509) 327-5591*

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 10

1.5. Defendant LIBERTY MUTUAL SHORT TERM DISABILITY
PLAN, is an employee disability plan subject to suit pursuant to 29
U.S.C. §1001 - §1464.

    1.5.1.    Liberty Mutual Short Term Disability Plan is self-insured
        by Liberty Mutual Group, Inc.

1.6. Defendant LIBERTY MUTUAL LONG TERM DISABILITY PLAN
is an employee disability plan subject to suit pursuant to 29 U.S.C.
§1001 - §1464.

    1.6.1.    Liberty Mutual Long Term Disability Plan is insured by
        Liberty Life Assurance Company of Boston, which is a
        subsidiary of Liberty Mutual Group, Inc.

## 2. **JURISDICTION & VENUE**

2.1. The United States District Court has jurisdiction over the parties and
over the subject matter in this litigation including original jurisdiction
pursuant to 29 U.S.C. §1001 - §1464 and 29 U.S.C. §1132, and also
pendent jurisdiction for related state claims arising from the same
acts and omissions by Defendants, and each of them.

2.2. The proper venue is Eastern District of Washington.

2.3. Plaintiff has exhausted all administrative remedies available under
the affected employee benefit plans at issue.

## 3. **FACTS**

3.1. Liberty Mutual Short Term Disability Plan.

Second Amended Complaint - 3

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA 99201*
*(509) 327-5591*

3.1.1.    On or about January 1, 1992 Defendants issued the Liberty Mutual Short-Term Disability Plan (the *1992 STD Plan*).

3.1.2.    The 1992 STD Plan was established by Liberty Mutual Insurance Company as a self-insured Short Term Disability Plan.

3.1.3.    A Group Disability Risk Management Agreement effective January 1, 1992 was executed between Liberty Mutual Insurance Company and Liberty Life Assurance Company of Boston for administrative services related to the Liberty Mutual Short Term Disability Plan as described in the document. ***See attached Exhibit A.***

3.1.4.    An Amended and Restated Liberty Mutual Short-Term Disability Plan was issued effective January 1, 2001 (the *2001 STD Plan*). ***See attached Exhibit B.***

3.1.5.    Prior to September 24, 2003 Liberty Mutual Insurance Company was the Plan Sponsor and also the Plan Administrator, for the Liberty Mutual Short Term Disability Plan.

3.1.6.    On or about September 24, 2003 Liberty Mutual Group, Inc. became the Plan Sponsor and Liberty Mutual Insurance Company became the Participating Employer, and also the Plan Administrator, for the Liberty Mutual Short Term Disability Plan.

3.1.7.    On or about November 12, 2008 an Amendment to Liberty Mutual Short Term Disability Plan was issued

Second Amended Complaint - 4

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 12

effective January 1, 2009 (the *2009 STD Plan*). ***See attached Exhibit C.***

    *3.1.8.*    Defendants issued a Summary Plan Description "Section E-1" effective January 1, 2014 (the *2014 Plan Description*) which includes and incorporates the 2009 STD Plan. ***See attached Exhibit D.***

    3.1.9.    The original action in this matter brought to obtain employee benefits under the 2009 STD Plan was filed March 4, 2015 and timely brought. This First Amended Complaint relates back to the original date of filing.

3.2. Liberty Mutual Long Term Disability Plan

    3.2.1.    On or about January 1, 1992 defendants established the Liberty Mutual Long Term Disability Plan with the Liberty Life Assurance Company of Boston (the *1992 LTD Plan*).

    3.2.1.1.    Long term disability benefits are available only as a continuation of short term disability benefits.

    3.2.2.    The 1992 LTD Plan was amended and restated with an effective date of January 1, 2001 (the *2001 LTD Plan*).

    3.2.3.    The 2001 LTD Plan was amended with an effective date of September 24, 2003 (the *2003 LTD Plan*).

    3.2.4.    Prior to September 24, 2003 Liberty Mutual Insurance Company was the Plan Sponsor and also the Plan Administrator, for the Liberty Mutual Long Term Disability Plan.

    3.2.5.    On or about September 24, 2003 Liberty Mutual Group, Inc. became the Plan Sponsor and Liberty Mutual Insurance

Second Amended Complaint - 5

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

Company became the Participating Employer, and also the Plan Administrator, for the Liberty Mutual Long Term Disability Plan.

3.2.6.    Liberty Life Assurance Company of Boston reissued Group Disability Income Policy GF3-800-000001-01 effective January 1, 2007 to insure the Long Term Disability coverage (the *2007 LDT Policy*) with terms and conditions described in the document. ***See attached Exhibit E.***

3.2.7.    On or about November 12, 2008 defendants adopted an Amendment to the Liberty Mutual Long Term Disability Plan effective January 1, 2009 (the *2009 LTD Plan*). ***See attached Exhibit F.***

3.2.8.    Defendants issued a Long Term Disability Plan Summary Plan Description "Section E-2" effective January 2, 2014 (the *2014 E-2 SPD*) which includes and incorporates the 2009 LTD Plan. ***See attached Exhibit G.***

3.2.9.    The original action in this matter brought to obtain employee benefits under the 2009 LTD Plan was filed March 4, 2015 and timely brought. This First Amended Complaint relates back to the original date of filing.

3.3. As Plan Administrator Liberty Mutual Insurance Company is a fiduciary under the applicable Short Term Disability plans and the Long Term Disability plans.

3.4. As Plan Sponsor Liberty Mutual Group, Inc. is a fiduciary under the applicable Short Term Disability plans and the Long Term Disability plans.

Second Amended Complaint - 6

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

3.5. Prior to 2008 Plaintiff was employed by Safeco Insurance.

3.6. Liberty Mutual Insurance Company acquired Safeco Insurance Company in or about 2008.

3.7. Plaintiff continued to be employed by Liberty Mutual Insurance Company and/or its subsidiaries after Safeco Insurance was acquired.

3.8. As a result of a traffic accident in 2004 accident Plaintiff received lumbar decompression and fusion surgery in or about September 2009.

3.9. At all times relevant to this litigation Plaintiff was provided coverage under the Liberty Mutual Short Term Disability Plan as part of his employment compensation package, and was eligible to receive benefits under that plan.

3.10.    At all times relevant to this litigation Plaintiff was provided coverage under the Liberty Mutual Long Term Disability Plan as part of his employment compensation package, and was eligible to receive benefits under that plan.

3.11.    Plaintiff's job duties required him to stand and/or sit at a desk to review information and prepare required written reports and correspondence regarding complex insurance claims, in addition to other related matters and projects assigned to him from time to time.

3.12.    Plaintiff notified Defendants on multiple occasions he has chronic pain, and that sitting as well as standing aggravates his symptoms and causes additional pains, aches, and spasm which causes him to work more slowly, and results in cognitive problems that interfere with his job performance from time to time.

Second Amended Complaint - 7

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 15**

3.13.   Defendant imposed new minimum required production goals and/or objectives as part of Plaintiff's job duties.

    3.13.1.   Because of his disability and intractable chronic pain Plaintiff was unable to meet those goals even when he worked 60-70 hours per week instead of the usual 37.5 hours Defendants worked by other employees.

    3.13.2.   Defendants did not compensate Plaintiff for the extra hours he worked in his attempts to meet the minimum production requirements.

3.14.   On or about July 15, 2013 Plaintiff submitted a claim for short term disability benefits.

3.15.   On or about August 20, 2013, Liberty Life Assurance Co. of Boston Disability Case Manager Sheri Dame sent Plaintiff a letter denying his claim for benefits under the 2009 STD Plan, stating that Plaintiff did "*not meet your Plan's definition of disability*".

3.16.   On or about August 22, 2013 Defendants issued notice to the Plaintiff that he was required to repay the short term disability benefits previously awarded to him.

3.17.   On or about August 26, 2013 Dr. Glen Stream, MD sent Liberty Life Assurance Co. of Boston a letter affirming that Plaintiff was medically disabled from work, that his prognosis was uncertain, and that his disability was possibly permanent.

3.18.   In or about September 2013 Plaintiff had surgery to implant a nerve stimulator in an attempt to control his intractable pain.

3.19.   On or about October 10, 2013 Liberty Life Assurance Co. of Boston Associate Claims Case Manager 1 Joshua Paterson issued a

Second Amended Complaint - 8

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

letter to Plaintiff advising that the claim for benefits under the Liberty Mutual Insurance's Short Term Disability (STD) Plan was approved *"based on your inability to perform the duties of your occupation."* The letter stated that the disability date was July 15, 2013 through October 31, 2013.

3.20.    On or about October 15, 2013 Plaintiff attempted to return to work pursuant to the terms of a medical release limiting him to 4 hours of employment duties per day. However, because of continued chronic pain he was unable to complete all the tasks assigned to him within the time allotted.

3.21.    On or about December 31, 2013, or shortly thereafter, Plaintiff's supervisor conducted an employment performance evaluation of Plaintiff's work from January 1, 2013 through December 31, 2013.

3.22.    Plaintiff received reduced ratings in the 2013 employment performance evaluation because pain and disability impaired his cognitive functions, which slowed the pace of work, and he unable to complete the full load of assigned work within the time allotted.

    3.22.1.    Plaintiff received annual performance ratings from Defendant indicating he was exceeding expectations in 2009, 2010, 2011, and 2012. In 2012 he received awards for his exceptional job performance.

    3.22.2.    In 2013 Plaintiff was given a rating of "3" out of a possible "15".

Second Amended Complaint - 9

*Law Offices of J. Scott Miller, P.S.*
201 W. North River Drive
Suite 305
Spokane, WA 99201
(509) 327-5591

3.22.3.   The 2013 employment performance evaluation failed to take into consideration Plaintiff's disabilities, resulting in low performance ratings which interfered with plaintiff's income.

3.23.   On November 11, 2013 Plaintiff's primary care provider, Darin P. Eckert, M.D., sent a letter "To Whom it May Concern" indicating Plaintiff could work no more than 4 hours per day until December 9, 2013.

3.24.   On December 6, 2013 Plaintiff's primary care provider, Darin P. Eckert, M.D., sent a letter "To Whom it May Concern" indicating Plaintiff could work no more than 4 hours per day until January 5, 2014.

3.25.   On or about January 3, 2014 Plaintiff attempted to return to work full time but was only able to work for one week before he was compelled to reduce his time at work first to 7.5 hours per day, then to 6 hours per day, and then to 4 hours per day.

3.26.   On or about January 10, 2014 Plaintiff's primary care provider, Darin P. Eckert, M.D., sent a letter "To Whom it May Concern" indicating Plaintiff could work no more than 6 hours per day until February 12, 2014.

3.27.   On or about February 25, 2014 Plaintiff's primary care provider, Darin P. Eckert, M.D., sent a letter "To Whom it May Concern" indicating Plaintiff could work no more than 4 hours per day. No end date was provided.

3.28.   On or about February 25, 2014 Plaintiff's primary care provider, Darin P. Eckert, MD, sent a letter to Liberty Life Assurance Co. of Boston Associate Claims Case Manager Joshua Paterson

Second Amended Complaint - 10

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

explaining that it was his "*professional opinion that his current chronic medical condition prevents him from performing the Material and Substantial Duties of his Own Job.*"

3.29.    On or about March 12, 2014 Ryan Barnes, MD, sent a letter to Defendants explaining that Plaintiff's medical condition would permanently impair his ability to work. Dr. Barnes stated, "*His history, exam and imaging are consistent with failed back syndrome, likely related to epidural fibrosis. He has exhausted treatment options and will likely be dealing with this level of pain in the long future. Because of the intensity of this pain, he is unable to perform the material and substantial duties of his own job. I do not see any realistic vocational rehabilitation options for this gentleman and he will struggle with disability for job employment permanently.*"

3.30.    At all times relevant to this litigation, Plaintiff attempted to continue working by taking prescription pain medications, and by sitting on ice packs, and by alternating between sitting and standing. However the chronic pain was severe and he was unable to produce the volume of work required by Defendants.

3.31.    By March 10, 2014 the pain was so severe Plaintiff was unable to work, and on March 17, 2014 he was compelled to stop work entirely. Because of his disability Plaintiff was unable to meet the work production requirements imposed on him.

3.32.    On or about April 21, 2014 Liberty Life Assurance Co. of Boston Associate Claims Case Manager 1 Joshua Paterson issued a letter to Plaintiff, stating "*you no longer meet your Plan's definition of disability and we must close your claim.*"

Second Amended Complaint - 11

*Law Offices of J. Scott Miller, P.S.*
201 W. North River Drive
Suite 305
Spokane, WA  99201
(509) 327-5591

3.32.1.    The letter further stated that to receive benefits the Liberty Mutual Group Inc.'s Short Term Disability Plan requires Plaintiff to meet the following definition of disability: *"'Disability' or 'Disabled' means the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job."*

3.32.2.    The letter included confirmation that Short Term Disability Benefits had been paid since July 22, 2013.

3.32.3.    The letter stated that defendants had "*completed a thorough review*" of Plaintiff's eligibility for ongoing disability benefits.

3.32.4.    By denying benefits under the Short Term Disability Plan Defendants prevented Plaintiff from receiving benefits under the 2009 Long Term Disability

3.33.    On or about April 23, 2014 Liberty Mutual Insurance Human Resources Associate, Joe Nardo, sent an email to Plaintiff's Supervisor, Mark Schafer (with a copy to Andrea Hollingsed, Human Resources, PI Safeco Claims) indicating that the Plaintiff's application for STD benefits was denied because "*Medical received does not support disability.*"

3.34.    On or about April 24, 2014 Defendant issued notice to the Plaintiff that he was required to repay the short term disability benefits previously awarded to him.

3.35.    On or about May 14, 2014 Plaintiff submitted a timely request to Defendants for reconsideration of the denial of STD benefits.

Second Amended Complaint - 12

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

3.36.    On or about July 18, 2014 Defendants denied Plaintiff's request for reconsideration of the denial of his claim submitted for Short Term Disability Plan benefits.

    3.36.1.    Plaintiff's administrative rights of appeal were deemed by the Defendants to have been exhausted July 18, 2014.

3.37.    On or about September 1, 2014 the Social Security Administration determined Plaintiff was totally and permanently disabled effective March 10, 2014. Plaintiff received his first SSD in October, 2014.

3.38.    On September 16, 2014 Defendants sent written notice that because he was disabled, and because his doctors would not release him to return to work, Plaintiff was deemed to have voluntarily resigned from his employment.

    3.38.1.    Defendants terminated Plaintiff's employment without his consent or agreement.

3.39.    On or about October 2, 2014 Defendants issued notice to the Plaintiff that he was required to repay $5,792.64 of benefits he previously received under the 2009 STD Plan.

3.40.    On October 16, 2014 Plaintiff's primary care provider, Dr. Darin Eckert issued written notice to Defendant that Plaintiff had a chronic medical condition that prevents him from performing the material and substantial duties of his job.

3.41.    Defendants failed or refused to have Plaintiff examined a medical doctor before determining that he was not disabled as defined in either the 2009 STD Plan or the 2009 LTD Plan.

3.42.    Defendants failed or refused to accept the medical opinions of

Second Amended Complaint - 13

Law Offices of J. Scott Miller, P.S.
201 W. North River Drive
Suite 305
Spokane, WA 99201
(509) 327-5591

Plaintiff's treating physicians and health care providers showing that
he is totally and permanently disabled.

3.43.    Defendants through acts and omissions wrongfully deprived
Plaintiff of his complete employment compensation package
including but not limited to wages, STD and LTD insurance benefits,
retirement benefits, employee discounts for life, automobile and
home insurance coverage, and his severance package.

3.44.    Plaintiff is a participant or beneficiary of an employee benefit
plan as defined in Title 29 U.S.C.A. §1001 - §1464, including but not
limited to and 29 U.S.C. §1132 (a/k/a ERISA Sec. 502).

3.45.    Defendants through acts and omissions failed to operate the
Liberty Mutual Short Term Disability Plan and/or the Liberty Mutual
Long Term Disability Plan prudently and for the exclusive benefit of
the participants, including the Plaintiff, in violation of Title 29
U.S.C.A. §1001 - §1464 including but not limited to and 29 U.S.C.
§1132 (a/k/a ERISA Sec. 502).

3.46.    Defendants through acts and omissions failed to follow the
terms of the Liberty Mutual Short Term Disability Plan and/or the
Liberty Mutual Long Term Disability Plan took adverse action
against the Plaintiff in violation of 29 U.S.C. §1001 - §1464 Title 29
U.S.C.A. §1001 - §1464, including but not limited to and 29 U.S.C.
§1132 (a/k/a ERISA Sec. 502), in retaliation for submitting claims
under the Liberty Mutual Short Term Disability Plan and/or the
Liberty Mutual Long Term Disability Plan.

Second Amended Complaint - 14

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

# 4.  CAUSES OF ACTION

## 4.1. Violation of ERISA Statutes

4.1.1.    Plaintiff realleges and reasserts paragraphs 1.1-3.46 as though fully set forth herein

4.1.2.    Plaintiff was wrongfully denied benefits available to him under the Short Term Disability Plan, which has caused him injury and losses in an amount to be proven at the time of trial.

4.1.3.    Plaintiff was wrongfully denied benefits under the Long Term Disability Plan which has caused him injury and losses in an amount to be proven at the time of trial.

4.1.4.    The acts and omissions of the Defendants were arbitrary and capricious, and without due care, skill, prudence or diligence.

4.1.5.    The acts and omissions of the Defendants were in violation of Title 29 U.S.C.A. §1001 - §1464 including but not limited to and 29 U.S.C. §1132 (a/k/a ERISA Sec. 502).

## 4.2. Violation of Washington Law Against Discrimination

4.2.1.    Plaintiff realleges and reasserts paragraph 1.1-3.46 as though fully set forth herein.

4.2.2.    The acts and omissions of Defendants, directly and indirectly, were in violation of Title 49.60 RCW and RCW 49.60.030, for which Plaintiff is entitled to damages in an amount to be proven at the time of trial.

## 4.3. Violation of Federal Americans with Disabilities Act

4.3.1.    Plaintiff realleges and reasserts paragraph 1.1-3.46 as though fully set forth herein.

Second Amended Complaint - 15

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

4.3.2.    The acts and omissions of Defendants, directly and indirectly, were in violation of Americans With Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990) for which Plaintiff is entitled to damages in an amount to be proven at the time of trial.

## 4.4. Wrongful Termination

4.4.1.    Plaintiff realleges and reasserts paragraph 1.1-3.46 as though fully set forth herein.

4.4.2.    The acts and omissions of Defendant, whether direct, indirect, or otherwise, constitute constructive discharge from Plaintiff's employment, in violation of state and federal statutory and constitutional protections, which has cause the Plaintiff harm and damage in an amount to be proven at the time of trial.

## 4.5. Breach of Insurance Contract

4.5.1.    Plaintiff realleges and reasserts paragraph 1.1-3.46 as though fully set forth herein.

4.5.2.    Defendant's acts and omissions whether direct, indirect, or otherwise, constitute a breach of contract for coverage of short term disability and/or long term disability benefits under the terms and conditions of the insurance policies provided to Plaintiff as a component of his employment compensation, for which the Plaintiff is entitled to recover damages in an amount to be proven at the time of trial.

Second Amended Complaint - 16

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

**4.6. Breach of Employment Agreement**

    4.6.1.    Plaintiff realleges and reasserts paragraph 1.1-3.46 as though fully set forth herein.

    4.6.2.    Defendant's acts and omissions whether direct, indirect, or otherwise, constitute a breach of contract for employment as set forth in the various manuals, documents and instructions provided to Plaintiff including but not limited the Defendant's obligations to provide a fair and honest evaluation of the Plaintiff's work performance.

    4.6.3.    Defendants failed or refused to provide Plaintiff with employment compensation package including but not limited to the STD Plan benefits and LTD Plan benefits, contrary to the representations and promises in the Employee Handbook and as described to the Plaintiff by Defendants' employees.

**4.7. Infliction of Emotional Distress**

    4.7.1.    Plaintiff realleges and reasserts paragraph 1.1-3.42 as though fully set forth herein.

    4.7.2.    Defendant's acts and omissions whether direct, indirect, or otherwise, did negligently, recklessly, and/or intentionally foreseeably inflicted emotional distress on Plaintiff for which he is entitled to damages in an amount to be proven at the time of trial.

**4.8. Declaratory Relief**

    4.8.1.    Plaintiff realleges and reasserts paragraph 1.1-3.42 as though fully set forth herein.

Second Amended Complaint - 17

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA 99201*
*(509) 327-5591*

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 25**

4.8.2.    Plaintiff is entitled to a declaration by the court determining the relative rights and responsibilities by the parties to the various contracts at issue herein.

## 5. **PRAYER**

WHEREFORE the Plaintiff, having stated causes of action against the Defendant, hereby prays for relief as follows:

1. For all actual and special damages in an amount to be proven at the time of trial; and

2. For all general damages in an amount to be proven at the time of trial; and

3. For all actual and reasonable costs of litigation; and

4. For all statutory and actual reasonable attorney fees incurred in this litigation as allowed by law and by statute, including but not limited to Title 29 U.S.C.A. §1001 - §1464 and 29 U.S.C. §1132(g); and

5. For declaratory relief determining the respective and relative rights and obligations of the parties to the insurance and employment and other contracts at issue herein; and

6. For appropriate order(s) pursuant to 29 U.S.C. §1132(a)(1)(B) requiring Defendants to provide full coverage under the Liberty Mutual Short Term Disability Plan; and

7. For appropriate orders(s) pursuant to 29 U.S.C. §1132(a)(1)(B) requiring Defendants to provide full coverage under the Liberty Mutual  Long Term Disability Plan; and

Second Amended Complaint - 18

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

8. For such other and general relief as the court deems just and
   equitable.

DATED this ___ day of December, 2015

                         LAW OFFICES OF J. SCOTT MILLER, P.S.


                         By _____
                            J. Scott Miller, WSBA #14620
                            Attorney for Plaintiff

*Law Offices of J. Scott Miller, P.S.*
*201 W. North River Drive*
*Suite 305*
*Spokane, WA  99201*
*(509) 327-5591*

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 27**

DAHMEN v. LIBERTY MUTUAL GROUP, et. al.


No. 2:15-cv-76-SAB


# EXHIBIT A

# GROUP DISABILITY
## RISK MANAGEMENT AGREEMENT

Providing Administrative Services for:

## SHORT TERM DISABILITY COVERAGE

Plan Sponsored By:

LIBERTY MUTUAL INSURANCE COMPANY
175 Berkeley Street
Boston, MA  02117

## ADMINISTRATIVE SERVICES ONLY (ASO)
*(No Checks Arrangement(s) Included)*

Services Provided By:

Liberty Life Assurance Company of Boston

STD-DMA2

## DISABILITY RISK MANAGEMENT AGREEMENT

This Agreement is entered into between Liberty Mutual Insurance Company, hereinafter referred to as the Sponsor, and Liberty Life Assurance Company of Boston, hereinafter referred to as Liberty, and is effective on the date specified in Part Six.

WHEREAS, the Sponsor has established a self-insured Short Term Disability Plan, hereinafter called the Plan, which is outlined in the Plan Description attached to this Agreement as Annex A; and

WHEREAS, the Sponsor has requested Liberty to furnish the services described in Annex B attached to this Agreement, hereinafter referred to as the Services, with respect to the Plan;

NOW THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the Sponsor and Liberty agree as follows:

### Part One.    GENERAL PROVISIONS

A.  Final authority and responsibility for the Plan and its operation are vested in the Sponsor, and Liberty is empowered to act on behalf of the Sponsor for the Plan only as expressly stated in this Agreement or as mutually agreed in writing by Liberty and the Sponsor.

B.  It is understood that the legal and tax status of the Plan under applicable law are matters for the Sponsor's determination, and that Liberty bears no such responsibility. It is further understood that Liberty is neither the Administrator, a Fiduciary nor a named Fiduciary of the Plan for purposes of the Employee Retirement Income Security Act of 1974 or any state law of a similar nature.

### Part Two.    LIBERTY'S OBLIGATIONS

A.  On behalf of the Sponsor, Liberty will perform the Services described in Annex B in connection with the Plan.

B.  On the dates specified in Annex C, Liberty will report to the Sponsor the amount of the charges for the Services performed since the date of the last report.

C.  Liberty will furnish other reports, as requested by the Sponsor and agreed to in writing by Liberty, regarding this Agreement.

D.  Liberty will maintain a copy of all records used in the performance of any Service for the five (5) years following the calendar year in which the Service was performed. Thereafter, or in the event of this Agreement's earlier termination, at the Sponsor's request, Liberty will prepare a summary of recommended claims activity for the last 12 months.

The Sponsor, after giving Liberty 10 business days' written notice, may review and audit any such records in Liberty's possession at any time during Liberty's normal business hours.

All claims records are the property of the Sponsor and will be returned to the Sponsor after the termination of this Agreement, if requested.

STD-DMA2-2

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT**
**OF SECOND AMENDED COMPLAINT - 30**

LM 000644

# DISABILITY RISK MANAGEMENT AGREEMENT
### (Continued)

**Part Three.    THE SPONSOR'S OBLIGATIONS**

A.  The Sponsor will:  (1) furnish any information specifically required in Annex B; (2) establish and maintain such accounts and records, assume such responsibilities and perform such functions required in that Annex; and (3) furnish to Liberty any other information that Liberty may require to provide the Services.

B.  Liberty will not be considered to have failed to perform its obligations under this Agreement if any delay or non-performance on its part is due, in whole or in part, to the Sponsor's failure to discharge its own obligations promptly.  Liberty will inform the Sponsor in writing of any failure on their part to perform any of their obligations.

C.  The Sponsor will provide Liberty with the names of individuals authorized to act for the Sponsor in connection with this Agreement, together with a statement regarding the extent of their authority.

D.  The Sponsor will reimburse Liberty for any premium taxes or similar gross receipts taxes attributable to this Agreement, any related interest, fines or penalty charges, and any expenses incurred in reasonable legal efforts to avoid tax liability, whether successful or not.  Liberty will make reasonable legal efforts to avoid liability for any such taxes, interest, or penalties; but Liberty need not make any such efforts, after consulting with the Sponsor, which in its best reasonable judgment are unwarranted in view of the prospects for success, the amounts at stake, the number of taxable years affected, the value of the case as a precedent, the time and expense involved, or the potential effects on Liberty's other business.  Reimbursement will be paid by the Sponsor within 30 days of Liberty's notification.

**Part Four.    CHARGES FOR THE SERVICES**

A.  Charges for Services will be according to the Schedule of Charges described in Annex C attached to this Agreement.  Charges will be payable to Liberty by the Sponsor within 30 days after each date on which Liberty notifies the Sponsor of the amount of the charges for the Services performed.  Liberty will bill the Sponsor directly for the charges for the Services.

B.  Liberty may change the rates set forth in Annex C, Section I., "Administrative Service Charges", upon giving at least 31 days prior written notice of such change.  Subject to the agreement not to increase such rates for certain periods as specified in Annex C, no such changes will be made more often than once during any 12 month period that this Agreement is in effect; provided that if the number of covered lives increased by 25%, or the Sponsor modifies its Plan or requests that Liberty provide additional Services, Liberty may change the rates set forth in Annex C, Section I., "Administrative Service Charges", and the once-a-year restriction, and any agreement not to increase these rates for a certain period will not apply to such change.

The Administrative Service Charges are effective for the contract period effective January 1 through December 31 and any change in charges will be agreed to on or before August 1st prior to the January 1st of the new Contract Period.  Such change will become effective on the date Liberty designates, and will form a part of this Agreement.  The rates set forth in Section II. of Annex C, captioned "Other Disability Risk Management Service Charges", are not subject to the above paragraph as the rates shown in that Section are the prevailing rates at the date this Agreement is effective and they will be adjusted to the prevailing charge applicable to the type of service at the date the service is rendered.

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 31**

LM 000645

## DISABILITY RISK MANAGEMENT AGREEMENT
### (Continued)

Part Five.    TERMINATION OF AGREEMENT

A.  This Agreement may be terminated by the mutual agreement of both parties or by one party upon 30 days advance written notice to the other party.  Alternatively, this Agreement will terminate on the earliest of:

1.  The date specified in a written notice Liberty provides to the Sponsor of Liberty's intent to terminate this Agreement because any state or other jurisdiction enacts a law or interprets existing law in a manner which Liberty has determined, upon the advice of its counsel, will prohibit the continuance of this Agreement;

2.  Termination of the Plan; and

3.  Modification of the Plan; provided that the modification will not have the effect of terminating this Agreement: (a) if this Agreement is changed to make the modified plan the Plan under this Agreement; or (b) while this Agreement is being continued, by mutual agreement between Liberty and the Sponsor, in anticipation of such a change.

B.  In the event that this Agreement terminates, Liberty will stop furnishing claims management Services at 12:01 A.M. on the termination date.  Subject to the parties reaching agreement on expense charges and scope of services, Liberty will continue to provide services with respect to open and active claims that are under Liberty's management prior to the termination date of this Agreement.  All provisions of this Agreement will continue in effect with respect to such services.

C.  The rights and duties contained in any indemnification and/or hold harmless provisions of this Agreement will survive its termination.

Part Six.    MISCELLANEOUS PROVISIONS

A.  This Agreement includes all attached Annexes and Exhibits, and may be changed by an amendment signed by the Sponsor and a Liberty officer.

No term or provision of this Agreement will be waived and no breach will be excused, unless the waiver or consent is signed by the party claimed to have waived or given consent.

B.  The parties to this Agreement will promptly advise each other in writing of any potential or actual legal or regulatory proceedings concerning the Plan or the activities of either party with respect to the Plan.  Furthermore, the parties agree to cooperate with each other about potential or actual legal or regulatory proceedings.

C.  Any of the functions to be performed by Liberty under this Agreement may be performed by Liberty or any of its subsidiaries, affiliates, or parent companies, or any independent entity with whom Liberty contracts, and reference in Subpart Three. D and Three. E of the Agreement and I.A.2 of Annex B to Liberty, its directors, officers and employees, will also include such parent, affiliate or subsidiary, its directors, officers, and employees and such independent entity.

D.  The Sponsor authorizes Liberty to communicate to any reinsurer, with whom the Sponsor may contract for excess coverage, such timely information concerning the Sponsor's operations and loss experience as the reinsurer may require.

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT**
**OF SECOND AMENDED COMPLAINT - 32**

LM 000646

## DISABILITY RISK MANAGEMENT AGREEMENT
### (Continued)

Part Six.    MISCELLANEOUS PROVISIONS (Continued)

E.  Notwithstanding any other provision to the contrary, Liberty will have sole discretion in determining whether any claim or suit, arising by reason of any liability or alleged liability of Liberty in connection with the performance of any of its functions under this Agreement, will be paid, compromised, litigated or appealed, and Liberty will also have sole discretion regarding all matters of procedure and defense for any such claim or suit.

F.  While this Agreement is in effect and within one year after its termination, Liberty may audit the Sponsor's, and any affiliated employer's books and records which are relevant to this Agreement.

G.  The Performance Expectations are as specified in Exhibit 2 which becomes a part of this Agreement effective January 1, 1998.

In no event shall any determination by the Sponsor that Liberty has failed to meet the agreed upon expectations and/or any credit by Liberty of any portion of the fee to the Sponsor under the Performance Expectations as specified in Exhibit 2, be deemed to or be construed to constitute an admission, agreement or consent by Liberty that it has breached its obligations under this Agreement and/or otherwise failed to abide by or perform under the terms of this Agreement.

H.  This Agreement shall be governed by applicable federal law and by the laws of the state of Massachusetts.

I.  The effective date of this Agreement is:    January 1, 1992

The number of this Agreement is:    PD3-800-000001-01

IN WITNESS WHEREOF, Liberty and the Sponsor have caused this Agreement to be executed in duplicate by their respective officers duly authorized to do so.

Liberty Life Assurance Company Of Boston

Date _____

Witness _____

_____
Executive Vice President
Title

Liberty Mutual Insurance Company

Date _____

_____
Signature of Officer

Witness _____

_____
Title

PD3-800-000001-01 R (1) Effective January 1, 1998

STD-DMA2-8



Liberty Mutual Group

## ANNEX A-1
## of
## DISABILITY RISK MANAGEMENT AGREEMENT

### PLAN DESCRIPTION

The Liberty Mutual Short Term Disability Plan (the "Plan") is effective January 1, 1992.  The Plan anniversary date will occur each January 1st beginning in 1993.  The Plan provisions are more particularly set forth in the summary plan description, as the same may be amended from time to time.

The Sponsor agrees to administer the provisions of and pay the benefits provided by this Plan in accordance with its provisions.

PLEASE READ THIS PLAN CAREFULLY FOR FULL DETAILS.

PB3-800-000001-01 R (J) Effective January 1, 1998

STD-DMA2-0

1/2009

## D-1

## SHORT-TERM DISABILITY PLAN

### Overview

The Short-Term Disability (STD) Plan is designed to continue all or part of your pay when a non work-related disability due to Sickness or accident keeps you away from work for more than seven consecutive (7) calendar days and for up to 25 weeks. For purposes of this Summary Plan Description, the following terms shall have the following meanings: the "Company" means Liberty Mutual Group Inc.; "Participating Employers" means the Company and its subsidiaries that participate in the Plan.

### Eligibility

Regular full-time employees and regular part-time employees (if scheduled and regularly working 20 hours or more per week) on the U.S. payroll become eligible on the first day of employment. Individuals classified as independent contractors or leased employees are not eligible for coverage, even if they are later reclassified as common law employees for tax purposes.

### Cost

Employee contributions are not required. Short-Term Disability benefits are fully funded by the Plan Sponsor.

### Definitions

"Accidental Injury" or "Injury" means bodily impairment resulting directly from an accident.

"Mental Illness" means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

"Own Job" means the job that the covered employee was performing when Total Disability or Partial Disability began.

"Partial Disability" or "Partially Disabled" with respect to a covered employee means the ability to perform some, but not all, of the material and substantial duties of his or her regular occupation at his or her pre-disability regular schedule and the ability to work at least 30% of his or her regularly scheduled workweek (and in all cases a minimum of 10 hours per week). Generally, the transition from partial disability to a full return to the pre-disability regular schedule is expected to last four weeks.

"Plan Sponsor" means Liberty Mutual Group Inc.

LM 000649

1/2009

"Pre-Existing Condition" means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within twelve months prior to the Covered Person's Effective date.

"Sickness" means illness, disease, pregnancy or complications of pregnancy.

"Substance Abuse" means alcohol and/or drug abuse, addiction or dependency.

"Total disability" or "Totally disabled" with respect to a covered employee means the inability to perform all the material and substantial duties of his or her Own Job at his or her pre-disability regular schedule because of Injury or Sickness.

"Treatment" means consultation; care or services provided by a Physician including diagnostic measures and taking prescribed drugs and medicines.

"Work-Related Injury or Sickness" means those Injuries or Sicknesses that arise out of or in the course of employment for which you are eligible to receive or are receiving Workers' Compensation benefits under applicable law.

Short-Term Disability Benefits

Short-Term Disability benefits begin on the eighth consecutive calendar day of disability, provided that you have been certified by a fully licensed physician to be totally disabled and Group Market Disability Claims determines that benefits are payable. If your total disability is not certified by a physician, benefits are not payable. Your initial date of disability is your first scheduled work day that you are absent, not the date benefits begin.

For full-time employees, Flexible Time Off (FTO) or Personal Holidays or Company Holidays are used to continue your pay during the first five work days of your disability (your "waiting period"). If you do not have enough FTO or Personal Holidays to cover the waiting period in its entirety, you will only receive pay for the number of FTO or Personal Holidays you have accrued or Company Holidays, if applicable. You must use time accrued to cover the waiting period unless other State law provisions apply.

For part-time employees, the first five work days of your disability (your "waiting period") will be covered by 20 hours of FTO or Personal Holidays, or Company Holidays, if applicable. You must use time accrued to cover the waiting period unless other State law provisions apply.

After the waiting period, Short-Term Disability benefits may continue up to 25 weeks. The amount of your Short-Term Disability benefit is determined as follows:

- For each complete year of service (including past service credit*) you are eligible for one week of Short-Term Disability benefits at 100% of your weekly pay. For employees of Participating Employers, past service credit is defined as the length of service credited to regular full-time and regular part-time employees who have had prior service with the Participating Employers. Weekly pay is defined as:

  - For full-time non sales employees, weekly pay is defined as 1/52nd of your base rate of annual salary at the time you became disabled.

  - For full-time sales employees, weekly pay is defined as 1/52nd of your base rate of annual salary at the time you became disabled plus 1/52nd of sales bonuses and/or commissions paid to you in the most recent 12-month period at the time you became disabled.

1/2009

- For part-time non-sales employees, weekly pay is defined as 20 hours times your hourly rate at the time you became disabled.

- For part-time sales employees, weekly pay is defined as 20 hours times your hourly rate at the time you became disabled plus 1/52nd of sales bonuses and/or commissions paid to you in the most recent 12-month period at the time you became disabled.

* Then, for each additional week of Short-Term Disability, you will receive 66-2/3% of your weekly pay.

*Note: Generally only service with your employer during the period your employer is a Participating Employer counts for determining years of service for purposes of benefit calculation. In some cases, however, service with your employer prior to its entry into the Company controlled group or service with a previous employer, may be counted (the following employees are collectively referred to as the "Transferred Employees" in the Pre-Existing Condition Exclusion section of this Plan):

Transferred Employees

* Former CIGNA Bond Services employees who were employed as of January 24, 1994 receive credit for prior employment service with ICNA.

* Former CUMIS General Insurance Co. and CUNA Mutual General Agency of Texas employees who transferred to a Participating Employer in conjunction with the acquisition of CUMIS General on July 1, 1998 receive credit for prior employment service with CUNA Mutual Insurance Co.

* Golden Eagle Insurance Corporation employees who were employed as of October 1, 1997 receive credit for prior employment service with Golden Eagle Insurance Co.

* Liberty Real Estate Management, Inc. employees who were employed on January 1, 1997 receive credit for prior employment service with Liberty Real Estate Group, Inc. and Liberty Sanibel II Limited Partnership.

* WorkWell Health & Safety, Inc. employees (WorkWell), formerly doing business as Systems and Software Group (SSG) Inc.) who were employed as of the acquisition date of March 1, 1997 receive credit for prior employment service with WorkWell/SSG from the later of May 1, 1991 or the employee's date of hire.

* Wausau Service Corporation and former Nationwide Trial Division employees who were employed as of the acquisition date of December 31, 1998 receive credit for prior employment service with Wausau Service Corporation or Nationwide Trial Division.

* Atlantic Health Group employees who were employed as of March 31, 1997 receive credit for prior employment service with New England Health Group from the later of January 2, 1996 or the employee's date of hire.

* ACE employees who were employed as of January 1, 2000 receive credit for prior continuous service from their last full-time hire date with CIGNA (if they transferred from CIGNA to ACE on July 2, 1999) or from their last full-time hire date with ACE (if hired by ACE after July 2, 1999).

* ALM employees who were employed as of November 22, 1999 receive credit for prior employment service with ALM.

* American Ambassador employees who were employed as of September 13, 1999 receive credit for prior employment service with American Ambassador.

1/2009

- Employees of Liberty Energy Corporation who transferred to a Participating Employer on July 3, 2000 receive credit for prior employment service with Liberty Financial Services.

- Employees and former employees of Colorado Casualty Insurance Company, Liberty Insurance Holding, Inc. and its directly and indirectly owned subsidiaries (collectively, "LIH"), and Summit Holdings Southeast, Inc. and its directly and indirectly owned subsidiaries, and Montgomery Mutual Insurance Company (known collectively as the "RAM Companies") who were employed by a Participating Employer as of January 1, 2001 receive credit for employment service with RAM Companies.

- RAM and Liberty Mutual employees who were former employees of OneBeacon Insurance Company on December 31, 2001 and who are employed by Participating Employers on January 1, 2002 receive credit for prior employment service with OneBeacon companies.

- Former employees of Merchants Holding Corporation who transferred and became employees of The Netherlands Insurance Company on April 1, 2002 receive credit for prior employment service with Merchants Holding Corporation.

- Cascade Disability Management, Inc. ("Cascade") employees employed with Cascade as of January 1, 2003 receive credit for prior employment service with Cascade.

- Former employees of Liberty Financial Companies, Inc. ("LFC") who are employed by Participating Employers on or after January 1, 2003 receive credit for prior employment service with LFC.

- Former employees of Prudential Commercial Insurance Company, Inc., Prudential General Insurance Company, and Prudential Property and Casualty Insurance Company (collectively referred to as "Prudential") who transferred to Participating Employers on November 1, 2003 receive credit for prior employment service with Prudential.

- Liberty Northwest employees employed with Liberty Northwest as of January 1, 2005 receive credit for prior employment service with Liberty Northwest.

- Former employees of Ohio Casualty Corporation (OCAS) transitioning to Participating Employers on January 1, 2008 will receive credit for prior employment service with Ohio Casualty Corporation (OCAS).

- Former employees of Safeco Corporation and subsidiaries transitioning to Participating Employers on January 1, 2009 will receive credit for prior employment service with Safeco Corporation.

## Partial Short-Term Disability

This benefit is intended to help partially disabled employees, with an initial disability date of January 1, 2003, or later, make the transition from total disability to a return to their pre-disability regular schedule generally over a four-week period.

To be eligible for partial disability benefits, you must:

(1) have been absent from work due to an approved Short-Term Disability and have satisfied the Short-Term Disability waiting period;

(2) be able to perform some, but not all, of the material and substantial duties of your occupation at your pre-disability regular schedule;

(3) be able to work at least 50% of your regularly scheduled workweek prior to disability (and a minimum of 10 hours per week);

IV 5 4

BEN 67

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT OF SECOND AMENDED COMPLAINT - 38**

LM 000652

1/2009

(4)   present certification from a fully licensed physician which indicates the specific work restrictions and applicable dates; and

(5)   receive the approval of your supervisor or manager.

Partial disability will generally cease after four weeks; however, in all events, partial disability will cease on the date that Group Market Disability Claims determines that you are no longer partially disabled; the date you are able to work in your occupation on your pre-disability regular schedule; or the date you die.

Full-time employees are returned to an active status and receive 100% of pay during any period for which they are partially disabled, subject to deductions from their earned FTO for FTO taken during the partial disability period in accordance with the policies of the Plan Sponsor. Part-time employees will be paid 100% of pay for actual hours worked during partial disability. The partial disability period does not apply to the Long-Term Disability (LTD) Plan elimination period.

All pay increases will apply upon return to work on a partial basis; however, if you are totally disabled again as a result of the same Injury or Sickness within six months, your Short-Term Disability benefit will be based on the rate of weekly pay as of the initial date of disability.

After 26 weeks of disability (one week of Flexible Time Off/Personal Holidays plus 25 weeks of Short-Term Disability, excluding Partial Disability), Long-Term Disability benefits may begin. Refer to D-2, Long-Term Disability, for details.

The following is an overview of the disability plans:

| Week 1 | Weeks 2 - 26 | | After 26 weeks |
|---|---|---|---|
| Waiting Period | Short-Term Total Disability | | Long-Term Disability |
| Five days (or 20 hours) FTO and/or Personal or Company Holidays used (if available, and unless other State law provisions apply) | One week for each year of service as of the date of disability (up to 25): 100% of weekly pay | Remaining weeks of Short-Term Disability: 66-2/3% of weekly pay | 40%, 50% or 60% of weekly pay (depending on option you selected) |

**If You Are Disabled Again**

If you return to work and become totally disabled again from the same Injury or Sickness within six months, your recurrent disability will be considered as a continuation of the original disability and no new waiting period will apply. Short-Term Disability benefits will be based on the rate of pay as of the initial date of disability. Short-Term Disability benefits will be paid only for the remaining portion of the 25-week disability period which excludes the partial disability period. A new Short-Term Disability benefit period begins only if you:

(a)   have been back to work full-time six months or more and become totally disabled again due to the same Injury or Sickness, or

(b)   have returned to work full-time and become disabled due to an unrelated Injury or Sickness

1/2009

## How to Claim Your Short-Term Disability Benefits

### Notify Your Supervisor or Manager

You should, if possible, notify your supervisor or manager in advance of a pending Short-Term Disability absence. If the absence is unanticipated, you must notify your supervisor or manager on the first day of disability and at regular intervals thereafter as agreed upon with your supervisor or manager. In either event, your claim for Short-Term Disability benefits and related medical information from your provider must be received by Group Market Disability Claims within 8 days from the date of your disability in order for benefits to continue without interruption.

### Call The Toll-Free Disability Claim Telephone Reporting Service

After you have notified your supervisor or manager, and as soon as you know if your Sickness or Injury may last more than seven consecutive calendar days, you must report your disability claim. You may also report a claim up to 2 weeks in advance of a pre-scheduled surgery or treatment. You must report your claim, including maternity claims.

All Short-Term Disability claims must be reported by calling the Disability Claim Telephone Reporting Service at their toll-free number: 1-800-260-2170. If you are hearing impaired and have a TDD system, you may elect to call the following AT&T Relay Service number: 1-800-855-2880. A representative will take claim information from you or a family member (if you are not able to call), including your name, Social Security Number and other personal information, office location, supervisor's name, nature of your disability and information about your treating physician and office visits.

This information will be sent to the Group Market Disability Claims department for review. Your physician will be contacted by a Group Market Disability Case Manager to obtain enough medical information to determine your eligibility for Short-Term Disability benefits. It is important that your attending physician provide the information requested by Group Market Disability Claims, including, but not limited to: your diagnosis; treatment program; dates of treatment; if applicable, the type of surgery and date performed and an estimated return to work date. This information should be provided to Group Market Disability Claims as soon as possible so that your benefit checks are not delayed. Any additional information needed from you will be requested by Group Market Disability Claims.

In order for your physician to provide this medical information to Group Market Disability Claims, you will need to sign a release. This is on the Disability Claim Telephone Reporting Service *Wallet Card*, which you can print off the Employee Resource Center site. You should keep the card with you and take the card to your office visit with your attending physician. Copy the release and sign and date it when you first meet with your doctor regarding your disability.

Failure of your physician to provide the requested medical information could result in the denial of your claim.

Group Market Disability Claims will complete the review of your Short Term Disability claim and, if approved, authorize your Short-Term Disability benefits, if appropriate. Short-Term Disability benefit payments will be sent to you biweekly from Home Office Dover Payroll in lieu of your regular pay for up to 25 weeks, as long as you are determined to be totally disabled.

Return to Work Status

D 14                                                                                      BEN 69

1/2009

It is important to update your supervisor or manager regarding your return to work status at regular intervals during your recovery. Your supervisor or manager may also contact you for this information if they do not hear from you. You or your physician may also periodically be contacted by a Group Market Disability Claims representative for this information.

Your supervisor or manager, and the Group Market Disability Claims representative handling your Short-Term Disability claim all need to know when your restrictions and/or limitations no longer totally disable you from your job. If you are authorized to return to work by your physician with restrictions and/or limitations, your physician will provide you and Group Market Disability Claims with this information. Group Market Disability Claims will share limited information about your restrictions and/or limitations with your supervisor or manager so that your accommodation needs may be addressed.

## Your Responsibilities While On Disability Leave

You are expected to promptly report your claim to the Disability Claim Telephone Reporting Service and are expected to cooperate in the review of your claim. Benefits may be delayed if your claim is not reported as soon as you think you are going to be out more than seven consecutive calendar days. Benefits may be forfeited if your claim is not reported within thirty days from your initial date of disability. If it is not reasonably possible for you or a family member to file your claim within this 30-day period, you may still be eligible to receive benefits provided your claim is reported as soon as possible from your initial date of disability. However, unless delayed by your legal incapacity, your claim must be reported within 90 days after your initial date of disability or your benefits will be forfeited.

Also, if requested by Group Market Disability Claims, you are expected to follow through with your physician for treatments, to provide any medical information, and to complete any additional claim forms. You or your physician's failure to provide documentation, which in the judgment of Group Market Disability Claims supports a disability leave or is necessary to administer benefits, may result in loss of benefits, denial of your claim and your removal from disability status. This medical documentation must be submitted to Group Market Disability Claims within 15 days from your initial date of disability or 10 days from the date of request by Group Market Disability Claims. Any charges for the submission of documentation by your physician is your responsibility, not the responsibility of Group Market Disability Claims or the Plan Sponsor. If you are removed from total disability status, continued absence from your job may be unauthorized and cause for termination of employment.

### Independent Medical Examinations

Group Market Disability Claims has the right to have you examined by a physician as often as it deems reasonably necessary. The Company is not responsible for transportation charges incurred in the event the Company requests an independent medical examination. Failure to appear for an independent medical examination may result in benefits ceasing until a rescheduled independent medical examination is completed and may result in your being charged for the cost of the missed examination.

### Right to Disclosure

By reporting a Short-Term Disability claim, you agree to the release of information from your physician or other licensed health care providers, medical facility, government agency, insurance company, HMO, Plan Sponsor/Administrator, or employer regarding diagnosis, treatment and prognosis of your physical or mental condition and/or treatment, as well as any non-medical information about you to the Plan Sponsor, the particular company in the Company controlled group to which you are submitting a claim and its insurers, its local representatives or other persons or organizations providing claims management services to the Plan and

BE0s 62

1/2009

to those representatives of the Plan Sponsor who have a business use for such information.

This confidential information will be used as one factor to determine your eligibility for Short-Term Disability benefits. Any information obtained will not be released by the Company to any person or organization except to other companies in the Company controlled group of companies to whom you submit a claim and their insurers, their legal representatives or other persons or organizations providing claims management services to the Plan, those representatives of the Company who have a business use for such information and those to whom there is a legal obligation to provide the information. The clinical information, in combination with the physical and interpersonal/cognitive factors of your job and the contractual provisions under which you are covered, will be used to establish the most appropriate work absence duration.

## Leave of Absence

Your Short-Term Disability coverage will continue automatically during any approved leave of absence. If you do not return to work on your scheduled return date, your coverage will be terminated.

### Family/Medical Leave of Absence

Eligible employees can choose to take Family/Medical Leave after Short-Term Disability benefits end, provided that the Short-Term Disability period does not exceed 13 weeks. The Short-Term Disability period will be counted as Family/Medical Leave. Family/Medical Leave, not covered by the Short-Term Disability Plan, is unpaid time off. For important information on Family/Medical Leave of Absence, see Section 5 of the Liberty Mutual Employee Handbook.

### Military Leave

If your aggregate military leave during your employment with the Company is two years or less, coverage for Short-Term Disability will remain effective and all Plan provisions will apply, including the exclusions for "acts of war" set forth in the Limitations on Benefits section.

If, and when your aggregate military leave exceeds two years, coverage for Short-Term Disability will end.

## Your Other Benefits While Disabled

Your other payday deductions such as medical, dental, vision care, life insurance, Thrift-Incentive Plan (TIP), auto/homeowners' insurance, etc. will be deducted from your Short-Term Disability benefit payments in the same manner as they are from your regular paycheck. If your Short-Term Disability benefits are insufficient to cover the insurance deductions, there are two payment options:

- If your disability is less than 30 days, your payday deductions will be deducted from your first paycheck after you return to work.
- If your disability lasts 30 days or longer, you may be billed by Home Office Dover Payroll. Failure to make timely payments will result in loss of coverage.

## Statutory Disability Benefits

Eligible employees in California and Puerto Rico receive their statutory disability benefit payments as part of the Plan's benefit. Eligible employees in Hawaii, New Jersey, and New York will receive the statutory benefit from Liberty Life Assurance Company of Boston and the Short-Term Disability benefit, reduced by the amount of the statutory benefit, from the Plan via Home Office Dover Payroll. Eligible employees in Rhode

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 42**

LM 000656

1/2009

Island receive statutory disability benefits under the state T.D.I. Fund. Remember: Short-Term Disability benefits under this Plan are reduced by the amount of any statutory benefits you are eligible to receive.

## Coordination of Benefits

Short-Term Disability benefits are reduced by the amount of any of the following benefits you are eligible to receive: Social Security (including benefits for your spouse and children on account of your disability), special statutory disability benefits, no-fault benefits, or any group insurance plan benefits. If you are eligible, you are expected to apply for these benefits. Receipt of such benefits will not extend Short-Term Disability benefits beyond the limits set within this plan.

Your Short-Term Disability benefits will be further reduced by the amount of earnings you receive from any employment.

## Subrogation and Reimbursement

If your Sickness or Injury appears to be someone else's fault, benefits otherwise payable under the Short-Term Disability Plan for loss of time as a result of that Sickness or Injury will not be paid unless you or your legal representative agree:

- to repay the Company for such benefits to the extent that they are for losses for which payment is made to you by or on behalf of the person at fault;
- to allow the Company a lien on such payments and to hold such payments in trust for Liberty Mutual; and
- to execute and give to the Company any instruments needed to secure the rights set forth above.

Failure to hold or forward to the Plan any such payments shall constitute unjust enrichment and shall create a constructive trust over any such payments and subject you, your attorney or any other constructive trustee to an equitable action seeking an equitable lien or constructive trust, in addition to other remedies.

Further, when Short-Term Disability benefits have been paid on your behalf, the Company will be subrogated to all rights of recovery that you have against the person at fault. These subrogation rights will extend only to recovery of the amount the Company has paid. You must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to the Company.

## Benefit Overpayment

In the event that you receive Short-Term Disability benefits in excess of the amount to which you are entitled under the plan provisions, you will be expected to reimburse the Plan Sponsor for the amount of any overpayment. The Plan Sponsor has the right to recover such overpayment from you, including the right to reduce future disability benefits, if any.

LM 000657

1/2009

## Pre-Existing Condition Exclusion

A pre-existing condition is a condition resulting from Injury or Sickness for which an employee has received treatment or incurred expense within the 12-month period immediately preceding the employee's most recent date of hire*. The plan will pay benefits for days of absence caused by a pre-existing condition only if the date of disability occurs on or after the 12 month anniversary of the employee's most recent date of hire. However, the pre-existing condition exclusion will not be applied to pregnancy disability claims which arise, or for which benefits are payable, on or after January 1, 1998.

### Reinstated Employees

If your employment ends and you are reinstated within 30 days of the date your employment ended, your date of hire for purposes of coverage in the Short-Term Disability Plan will be reinstated to your most recent date of hire before your employment ended.

*For purposes of determining past service credit, the previous list of Transferred Employees are granted credit for their prior employment service as set forth therein for purposes of satisfying the pre-existing condition exclusion under the Plan.

## Limitations on Benefits

* Benefits will be forfeited if your claim for disability benefits is not reported within the 90-day period following your initial date of disability, unless delayed by your legal incapacity.

* Benefits will be forfeited or delayed if you are not being continuously treated by a fully licensed physician.

* Benefits are not payable for disability due to any act of declared or undeclared war, intentionally self-inflicted Injury or active participation in a riot.

* Benefits are not payable if the disability is sustained while committing or attempting to commit a felony or any type of assault or battery.

* Benefits for post-pregnancy disability are generally limited as follows: the STD period is generally limited to six weeks following the date of delivery or date of disability, whichever is later, in the event of a normal delivery, and eight weeks following the date of delivery or date of disability, whichever is later, in the event of a cesarean section delivery, precluding any complications. (Keep in mind that the first five work days of your disability will be covered by PTO/Personal Holidays/Company Holidays, if available, unless other State law provisions apply.) If complications arise which would extend the disability beyond the usual benefit period, medical evidence supporting that disability must be submitted.

* No benefit is payable for any portion of a period of disability due to mental illness and/or substance abuse unless you are engaged in a corrective program under the continuous guidance of a licensed physician.

* No benefit is payable for disability due to cosmetic surgery, unless surgery is in connection with an Injury or Sickness incurred while covered by the Short-Term Disability Plan.

* If you are in an active disability claim status on the date a benefit improvement in the duration or amount of benefits would otherwise become effective, the benefit improvement will not be effective until you return to work on a full-time or regular part-time basis.

* Merit increases and/or service anniversaries that were scheduled to occur during the Short-Term Disability, including the waiting period, do not apply towards the calculation of Short-Term Disability benefits.

1/2009

- No benefit is payable for a Work-Related Injury or Sickness occurring on or after January 1, 2007.

### When Coverage Terminates

Your coverage terminates when you cease to be employed by a Participating Employer. Pay received in lieu of accrued Flexible Time Off/Personal Holidays will not extend your employment or coverage.

Effective January 1, 2009, if you are on Short-Term Disability and your employment is terminated "for cause," your short term disability benefits will end on the date of termination of employment. If you continue to be disabled, you may apply for Long-Term Disability benefits subject to all terms and conditions of the LTD policy. (See Section D-2.)

Coverage also ceases when an employee changes to a different class of employment not eligible for this coverage (e.g., change to part-time status scheduled and regularly working less than 20 hours per week).

### Rights of Plan Participants (ERISA)

As a participant in the Liberty Mutual Short-Term Disability Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office and at other locations all documents governing the Plan including the Plan documents and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration
- Obtain copies upon written request to the Plan Administrator of Plan documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.
- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer or any other person, may terminate you or otherwise discriminate against you in any way to prevent you from obtaining benefits or exercising your rights under ERISA.

Under ERISA there are steps you can take to enforce your rights. For example, you may file suit in a federal court if:

- You have a claim for benefits which is denied or ignored, in whole or in part.
- You request materials from the Plan Administrator and do not receive them within 30 days. The court may require the Plan Administrator to provide the material and pay you up to $110 per day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.
- The Plan fiduciaries misuse the Plan's money, or you are discriminated against for asserting your rights. You may also seek assistance from the U.S. Department of Labor.

If successful the court may order the court will decide who should pay the court costs and legal fees. If you are the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs

1/2009

and fees; for example, if it finds your claim to be frivolous.

If you have any questions, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## Administration of the Plan

### Interpretation of Plan
The benefit plan summary plan description summarizes the important features of the plan document. While the summary plan description attempts to accurately describe benefits available as of the date of publication, it does not cover every provision of the plan. In the event of a question of interpretation or conflict, the plan document will govern.

### Authority of Plan Administrator
The Plan Administrator has the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payment of any benefits and decide any other matters relating to the administration or operation of the Plan. Any such interpretations or decisions of the Plan Administrator shall be conclusive and binding.

### Claims and Appeals Procedure
All claims by participants, beneficiaries, and others based on a purported failure to follow the Plan's terms, including but not limited to an alleged failure to follow any direction from a participant pursuant to Plan terms, an alleged administrative error or omission, or other alleged misconduct, are subject to the Plan's claims procedures.

If your claim is denied, in whole or in part, Group Market Disability Claims will provide you with a comprehensible notice setting forth:

    (a)   The specific reason or reasons for the denial;

    (b)   Specific reference to pertinent Plan provisions on which the denial is based;

    (c)   A description of any additional material or information necessary for you to submit to perfect your claim and an explanation of why such material or information is necessary;

    (d)   A description of the Plan's claim review procedure and time frames, including a statement of your right to bring a civil action under ERISA following an adverse decision on appeal;

    (e)   If applicable, any internal rule, guideline, protocol, or other similar criterion relied upon in making the adverse decision, or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon and a copy thereof will be provided free of charge upon request; and

    (f)   If the adverse decision was based on a medical necessity, experimental treatment, or similar exclusion or limit, an explanation of the scientific or clinical judgment for the adverse decision, or a statement that such explanation will be provided free of charge upon request.

Such written notice of denial will be given within 45 days after the claim is received by Group Market

1/2009

Disability Claims. This 45-day period may be extended for up to 30 days, if Group Market Disability Claims: (1) determines the extension is necessary because of matters beyond the Plan's control, and (2) notified you, before the end of the 45-day period, why the extension is needed and the expected decision date. If, before the end of the first 30-day extension, Group Market Disability determines, due to matters beyond the Plan's control, a decision cannot be rendered within that extension period, the determination period may be extended for up to an additional 30 days, provided Group Market Disability notifies you before the end of the first 30-day extension period, why the extension is needed and the expected decision date.

The notice of extension shall explain: (1) the standards on which benefit entitlement is based, (2) the unresolved issues that prevent a claim decision, and (3) the additional information needed. You have at least 45 days to provide the information.

The claim determination time frames begin when a claim is filed, without regard to whether all the information necessary to make a claim determination accompanies the filing.

If an extension is necessary because you failed to submit necessary information, the days from the date Group Market Disability sends you the extension notice until you respond to the request for additional information are not counted as part of the claim determination period.

If you disagree with a decision to deny the payment of any benefits, in whole or in part, you must submit your appeal, in writing, to Group Market Disability Claims, the designee of the Plan Administrator, within 180 days after you receive the notice of denial. You have the right to:

1. Submit, for review, written comments, documents, records and other information relating to the claim;

2. Request, free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim;

3. A review that takes into account all comments, documents, records, and other information submitted by you, without regard to whether such information was submitted or considered in the initial claim decision;

4. A review that does not afford deference to the initial adverse decision and which is conducted neither by the individual who made the adverse decision nor that person's subordinate;

5. If the appeal involves an adverse decision based on medical judgment, a review of your claim by a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, and who was neither consulted in connection with the adverse decision nor the subordinate of any such individual; and

6. The identification of medical or vocational experts, if any, consulted in connection with the claim denial, without regard to whether the advice was relied upon in making the decision.

Group Market Disability will make a full and fair review of your appeal and may require additional documents as it deems necessary in making such a review. A final decision on review will be made within a reasonable period of time but not later than 45 days following receipt of the written request for review unless Group Market Disability determines that special circumstances require an extension. In such case, a written extension notice will be sent to you before the end of the initial 45-day period. The extension notice shall indicate the special circumstances and the date by which Group Market Disability expects to render the appeal decision. The extension cannot exceed a period of 45 days from the end of the initial period.

The appeal time frames begin when an appeal is filed, without regard to whether all the information necessary to make an appeal decision accompanies the filing.

If an extension is necessary because you failed to submit necessary information, the days from the date Group

BHS 07

12.1.15

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT OF SECOND AMENDED COMPLAINT - 47**

LM 000661

1/2009

Market Disability sends you the extension notice until you respond to the request for additional information are not counted as part of the appeal determination period.

The notice of denial shall include:

1. The specific reason or reasons for denial with reference to those Plan provisions on which the denial is based;

2. A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to your claim;

3. A statement describing any voluntary appeal procedures offered by the Plan and your right to obtain the information about such procedures, and a statement of your right to bring an action under ERISA;

4. If applicable, any internal rule, guideline, protocol, or other similar criterion relied upon in making the adverse decision, or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon and a copy thereof will be provided free of charge upon request; and

5. If the adverse decision was based on a medical necessity, experimental treatment, or similar exclusion or limit, an explanation of the scientific or clinical judgment for the adverse decision, or a statement that such explanation will be provided free of charge upon request.

You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency.

The claims and appeals procedures set forth above apply to any claim filed on or after January 1, 2002. Claims filed prior to this date will follow the claims and appeals procedure set forth in the summary plan description in effect as of the initial disability claim filing date.

Legal Proceedings

You or your authorized representative cannot start any legal action until:

- the date on which your appeals rights have been exhausted; nor
- more than one year after the time proof of claim is required.

Legal actions are contingent upon first having followed the Claims and Appeals procedure outlined above.

Amendment/Termination

The Company or its parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, shall have the right at any time to: (i) amend, modify, or terminate the Short-Term Disability Plan provided that any such amendment, modification, or termination will not prejudice any claim or benefit under the Short-Term Disability Plan which was incurred but not paid prior to the amendment, modification, or termination; and (ii) delegate to the Chief Executive Officer of the Company the authority (a) to make any plan amendment required to bring the Short-Term Disability Plan into conformity with law or regulation; and (b) to amend the Short-Term Disability Plan provided such amendments are not considered material because the financial exposure to either the Short-Term Disability Plan or to the Plan Sponsor is not material and there is no change in the participants' benefits or any change is immaterial and/or the change is to the administrative provisions of the Short-Term Disability Plan, such as

D-1-44

1/2009

claims processes or allocation of responsibilities for administering various aspects of the Short-Term Disability Plan.

General Provisions

This Liberty Mutual Short-Term Disability Plan is effective January 1, 1992. If your Injury or Sickness occurred before January 1, 1992, and you have not returned to work, this plan will not apply until you return to full-time employment. The plan that was in effect on the date of your disability applies to you.

The Plan Sponsor is Liberty Mutual Group Inc. The employer identification number assigned by the Internal Revenue Service to Liberty Mutual Group Inc. is 04-3583679. The Plan number assigned in accordance with instructions of the Internal Revenue Service is 510. Plan records are maintained by Home Office Benefits on a calendar basis: January 1st through December 31st.

The Plan offers participation to employees of the Company and its subsidiaries that participate in the Plan, including, Liberty Mutual Insurance Company, 175 Berkeley Street, Boston, Massachusetts 02116. A list of participating subsidiaries is available on request.

The Liberty Mutual Short-Term Disability Plan is unfunded and self-insured by Liberty Mutual Group Inc., 175 Berkeley Street, Boston, Massachusetts 02116. Benefits are paid from the general assets of the Plan Sponsor. Liberty Life Assurance Company of Boston, through Group Market Disability Claims, provides administrative services only under the self-insured Liberty Mutual Short-Term Disability Plan.

For purposes of ERISA and the Plan, Liberty Mutual Insurance Company is the Plan Administrator. Your rights under ERISA are described above. Helen E. R. Sayles is designated as agent for service of legal process for the Plan Administrator. Process may be served on her at Liberty Mutual Insurance Company, 175 Berkeley Street, Boston, Massachusetts 02116, Attention: Benefits Department; phone number 1-617-654-4111.

RE N w7

12 1-15



Liberty Mutual Group

## ANNEX B
of
## DISABILITY RISK MANAGEMENT AGREEMENT
### ADMINISTRATIVE SERVICES

Effective January 1, 1992 between Liberty Life Assurance Company of Boston *(hereinafter referred to as Liberty)* and Liberty Mutual Insurance Company *(hereinafter referred to as the Sponsor).*

Administrative Services to be furnished by Liberty and certain obligations of the Sponsor in connection with the Plan of Benefits described in Annex A-1 of the Agreement and referred to as the Plan.

1.  Claims Services to be furnished on behalf of the Sponsor's self-insured Plan with respect to those classes of individuals for which Liberty will make claims recommendations as agreed by Liberty and the Sponsor.

    A.  Claims Payments and Control - While the Agreement is in effect, Liberty will accept for processing and recommendation, all claims for benefits under the Plan for which Proof of claim is furnished on a form or in a format satisfactory to Liberty.
    "Proof" means the evidence in support of a claim for benefits and includes, but is not limited to (a) a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits; (b) an Attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's Attending Physician; and (c) provision by the Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by Liberty in support of a claim for benefits.

        1.  Determination of Eligibility - For all classes listed in the Plan Description (referenced in Annex A-1), the Sponsor will determine each claimant's eligibility for benefits under the Plan and notify Liberty of such eligibility when the claim is filed. The Sponsor will furnish to Liberty, in a form or format satisfactory to Liberty, information identifying by name the persons then participating under the Plan, the effective dates of their participation, and the extent of their coverage under the Plan. Liberty will rely on the information furnished to it by the Sponsor; and the Sponsor will hold Liberty harmless for any inaccuracy in such information.

        2.  Claims Processing - Notice of claims will be received and processed telephonically as outlined in the attached Exhibit I which becomes a part of this Agreement effective July 1, 1997.
        During the term of this Agreement Liberty will (a) review and investigate all claims with a duration equal to or greater than the elimination period for the Plan shown in Annex A to establish the claimant's benefits under the terms of the Plan, and (b) review continuing benefit claims as often as necessary in order to recommend continuing benefit payment independent of determination, and process claims whereby benefit payments will be made to claimant. A determination of loss payable/non-payable may be made by Liberty within _____ days from the date Liberty is in receipt of the required _____ and financial evidence as indicated in Exhibit I.

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 50

LM 000664

ANNEX B
of
DISABILITY RISK MANAGEMENT AGREEMENT
ADMINISTRATIVE SERVICES
(Continued)

2.  Claims Processing (Continued)

In the event that the Sponsor determines that Liberty has misinterpreted the Plan and so
informs Liberty in writing, all claim recommendations reported after delivery of such writing
will be processed and recommendations will be made according to the Sponsor's
interpretation as described in such writing. Provided, however, that unless Liberty
specifically agrees in writing the Sponsor's interpretation will not be binding regarding any
insurance policy Liberty or its parents or affiliates issued.

If Liberty, upon the advice of its legal counsel, determines that the Sponsor's interpretation
would cause Liberty to violate applicable law, Liberty will so inform the Sponsor and will not
take any action to implement the Sponsor's interpretation until Liberty is satisfied with the
legality of the Sponsor's interpretation.

All doubtful claims will be referred to the Sponsor for its determination of liability.

3.  Claims Control - Liberty may investigate any claim or request that the claimant be examined
medically at any point during the life of the claim. In addition, Liberty will take such steps as
may be necessary to give effect to any integration or benefit offset provisions of the Plan.

4.  Payment of Claims - Whenever Liberty determines a benefit to be payable under the Plan,
Liberty will make the appropriate recommendation for benefit payment to the Sponsor. The
Sponsor will be responsible for the payment of all benefits under the Plan.

5.  Claims Review - The Sponsor will establish a procedure for reviewing disputed claims and
any requests from claimants for a review of rejected claims. Liberty will provide the Sponsor
with advice on any such claims. The Sponsor will make the determination as to the final
disposition of any ERISA appeals on claims that were denied or terminated by Liberty. The
appeal procedures are outlined in the denial letter provided to the employee. The employee
has 180 days from the date of the denial letter to submit an appeal. The appeal must be in
writing (from the employee or their legal representative) and contain additional information
to support the claim.

II.  Other Services To Be Furnished In Connection With The Plan

A.  Cost Analysis

At the Sponsor's request, Liberty will furnish the Sponsor with an estimate of the benefit cost of
any proposed modification or extension of the Sponsor's Plan of Benefits described in Annex A-1.
In connection therewith, Liberty will notify the Sponsor of any change in the Schedule of Charges
under the Agreement which would be required if the Plan were so modified or extended

B.  Materials to be Furnished

Liberty will furnish the Sponsor with a supply of Liberty's standard forms to be used for
submission of claims for benefits under the Plan, together with instructions for their use

PD3-800-000001-01 R (3) Effective January 1, 2002

SEE IMAGES

LM 000665

ANNEX B
of
DISABILITY RISK MANAGEMENT AGREEMENT
ADMINISTRATIVE SERVICES
(Continued)

C.  Disability Management Services - Managed Care

Liberty will make the following Managed Care services available on a fee for service basis to complement the Sponsor's self-funded program.

The following support services will be utilized if the Sponsor agrees to have such services provided:

* Medical Intervention by Managed Disability Services Unit - utilizing nurses (R.N.'s) in the Managed Disability Services Unit.  The nurse contacts the disabled employee, medical provider and employer/Sponsor and assesses the extent of disability and level of care being administered.  Where appropriate, the R. N. may refer the employee to quality medical providers or services, then follows up regularly with the employee, employer, claim analyst and provider to review medical progress and help coach and promote the early return-to-work.  At any time in the process the R. N. may refer problematic cases to the on-site R. N. for in person contact and case management activity.

* Vocational Rehabilitation - utilizing Liberty Mutual's rehabilitation company for assessments, re-training, and possible job placement.

* Catastrophic Case Management - utilizing case management services to handle catastrophic, traumatic, injury or illnesses (2nd or 3rd degree burns, spinal chord injuries, brain injuries, all severe crushing injuries, etc.) ions, majority extremity amputa

* Medical Service Center - utilizing Liberty's rehabilitation facility in Boston which treats a variety of disabilities.  Candidates from this program are referred from Gateway Case Management.

* Field _____ bility Nurse - utilizing a Managed Disability Managed to personally contact the claimant, Sponsor or provider to gather pertinent medical and claim information to assist in the evaluation of a particular claim.

* Peer Review - comprehensive review of the claimant's treatment plan performed by a professional in the same discipline as the provider.  Review of medical records only.  Does not include physical examination of the claimant.  Usually involves conversation between the reviewer and treating provider about the treatment plan.

* Independent Medical Examination (IME) - examinations conducted by professionals of the same or different discipline as the claimant's physician or provider.  Review includes medical records, x-ray films and physical examination of the claimant.  It may include recommendations for additional testing, to differentiate diagnosis or further evaluate treatment prognosis.  No conversation takes place between examining physician and treating physician.

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 52**                    LM 000666

**ANNEX B**
of
**DISABILITY RISK MANAGEMENT AGREEMENT**
**ADMINISTRATIVE SERVICES**
(Continued)

D   Disability Management Services - Other Services

*   Professional Investigation Services - Professional Investigation services typically include activities check, records check and/or surveillance. These investigations are only initiated when the information provided is inadequate or questionable, and the investigation is necessary to resolve doubt.

Note:   With respect to item(s) C. and D. above, expenses of $500 or more per Managed Care activity for any Disability Management Service will be approved by the Sponsor before delivery of such service(s).

E.  Other Services

1.  If the Sponsor requires information about the health of any persons desiring to participate in the Plan or to increase their coverage thereunder, Liberty will furnish forms for obtaining such information and will review and evaluate such information. At the Sponsor's request, Liberty will also arrange and evaluate medical examinations or inspection reports about such persons. The charges for such service(s) will be billed to the Sponsor.

2.  At the Sponsor's request, Liberty will assist the Sponsor in the design of (a) its Plan of Benefits, and any desired revisions thereof, (b) its certificate booklets, and any desired revisions thereof, and (c) any amendments to the Agreement.

STD-DMA2-49

**PLAINTIFF'S MOTION AND BRIEF IN SUPPORT**
**OF SECOND AMENDED COMPLAINT - 53**

LM 000667



Liberty Mutual Group

## ANNEX C
### of
## DISABILITY RISK MANAGEMENT AGREEMENT
### SCHEDULE of CHARGES

Effective January 1, 2006 between Liberty Life Assurance Company of Boston *(hereinafter referred to as Liberty)* and Liberty Mutual Insurance Company *(hereinafter referred to as the Sponsor)*.

I.    **Administrative Service Charges**

The monthly expense charge for the Administrative Services provided under the Agreement for each of the 12 months beginning on January 1, 2009 and ending on December 31, 2009, will be determined as follows:

For Administrative Services Charges:

Number of Employees covered under the Plan X monthly Per Employee Rate
Monthly per Employee Rate:          $       2.88

The actual monthly Employee exposure is the actual total number of Employees in Active Employment covered under the Plan as of the first day of the month.

II.   **Claims Submission Service Charges**
Telephonic Intake - $27.00 per claim.

III.  **Other Disability Risk Management Service Charges**

The amounts shown below are prevailing charges applicable to the service as of 1/1/99, except as otherwise noted. The amount that is charged for the service will be the prevailing charge applicable at the date the service is rendered. Liberty agrees to inform the Sponsor of the known prevailing charges each year.

For Disability Risk Management Services utilized:
*   Managed Disability Nurse Review - $80 per hour ($85 per hour in NY and CA)
*   Vocational Rehabilitation - Billed at cost
*   Independent Medical Examination - $300 - $600 for each investigation
*   Peer Review - $75 - $200 per hour
*   Surveillance - Billed at cost
*   ADA Analysis - $85 per hour
*   Legal Fees - Billed at cost
*   Catastrophic Case Management - $100 per hour
*   Return to Work Assistance - Billed at cost

FDS-SIG 005004-01 R-02 Effective January 1, 2009

SED-DMA2-11

ANNEX C
of
DISABILITY RISK MANAGEMENT AGREEMENT
SCHEDULE of CHARGES
(Continued)

III. Other Disability Risk Management Service Charges (Continued)

Employees - Billed at cost                                        *    Education and Training for

750 per evaluation                                               *    Ergonomic Assessments - $

sability Nurse - $80 per hour ($85 per hour in NY and CA) plus travel    *    Field Visits by Managed Di
                                                                      expenses

led at cost                                                      *    Medical Service Center - Bil

1,500 per claim                                                  *    Social Security Advocacy - $

the Sponsor each month detailing the services performed and their    Liberty will send a statement to
                                                                      related actual costs.

PD3-800-000001-01 R (J) Effective December 1, 2003

STD-DMA2-12

AMENDMENT TO
LIBERTY MUTUAL SHORT TERM DISABILITY PLAN

WHEREAS, the Compensation Committee of the Board of Directors of Liberty Mutual Holding Company Inc. passed a resolution dated November 12, 2008, amending the Liberty Mutual Short Term Disability Plan (the "Plan");

NOW THEREFORE, the Plan effective as of January 1, 2009, is amended as follows:

1. Section 5.1(a) is amended by adding the following provision at the beginning of the paragraph:

All claims by participants, beneficiaries, and others based on a purported failure to follow the Plan's terms, including but not limited to an alleged failure to follow any direction from a participant pursuant to Plan terms, an alleged administrative error or omission, or other alleged misconduct, are subject to the Plan's claims procedures.

2. Section 6.1 is amended in its entirety as follows:

*Section 6.1    Right to Amend*

The Company or its parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, shall have the right at any time to: (i) amend or modify the Plan; but in no event shall any such amendment or modification prejudice any claim or benefit under the Plan which was incurred but not paid prior to the amendment or modification; and (ii) delegate to the Chief Executive Officer of the Company the authority (a) to make any plan amendment required to bring the Plan into conformity with law or regulation; and (b) to amend the Plan provided such amendments are not considered material because the financial exposure to either the Plan or to the Plan Sponsor is not material and there is no change in the participants' benefits or any change is immaterial and/or the change is to the administrative provisions of the Plan, such as claims processes or allocation of responsibilities for administering various aspects of the Plan.

IN WITNESS WHEREOF, Liberty Mutual Group Inc. has caused this Amendment to be executed by its duly authorized officer effective January 1, 2009.

LIBERTY MUTUAL GROUP INC.

By: *Helen El Sayles*

LIBERTY MUTUAL INSURANCE COMPANY
AMENDMENT TO
LIBERTY MUTUAL SHORT TERM DISABILITY PLAN

WHEREAS, the Board of Directors of Liberty Mutual Insurance Company passed a resolution on September 10, 2003 which: (a) authorized an amendment of the Liberty Mutual Short Term Disability Plan ("Plan") so that, except as noted below, all references to "Liberty Mutual Insurance Company" would become references to "Liberty Mutual Group Inc.", (b) upon acceptance by Liberty Mutual Group Inc., transfers sponsorship of the Plan from Liberty Mutual Insurance Company to Liberty Mutual Group Inc., including the responsibility to fund the Plan, and (c) adopted the Plan as a Participating Employer;

WHEREAS, the Board of Directors of Liberty Mutual Group Inc. passed a resolution on September 10, 2003 which: (a) accepted the transfer of sponsorship of the Plan, (b) adopted the Plan as amended, (c) assumed all liabilities with respect to the Plan, (d) approved Liberty Mutual Insurance Company as a Participating Employer in the Plan, and (e) appointed Liberty Mutual Insurance Company as Plan Administrator;

NOW THEREFORE, effective as of September 24, 2003, the Plan is amended as follows:

1.    Section 1.1 is amended in its entirety to read as follows:

*Section 1.1        The Plan*

Liberty Mutual Insurance Company established the Liberty Mutual Short Term Disability Plan (the "Plan") effective January 1, 1992. The Plan was amended and restated as of January 1, 2001.

On September 10, 2003, the respective Boards of Directors of Liberty Mutual Insurance Company and Liberty Mutual Group Inc. passed resolutions effecting a transfer in the sponsorship of the Plan from Liberty Mutual Insurance Company to Liberty Mutual Group Inc., so that effective September 24, 2003, Liberty Mutual Group Inc. became the Plan Sponsor, and Liberty Mutual Insurance Company became a Participating Employer in the Plan and the Plan Administrator. In addition, in connection with such transfer, Liberty Mutual Group Inc. assumed all liabilities with respect to the Plan.

2.    Section 1.3(b) is amended in its entirety to read as follows:

(b)    "Company" means Liberty Mutual Group Inc. In the event of the reorganization, merger or similar transaction affecting the Company, any successor entity may adopt the Plan for the benefit of employees of such successor, in which event the Plan shall continue without any gap or lapse in coverage.

3.    Section 1.3(l) is amended in its entirety to read as follows:

(l)    "Plan Administrator" means Liberty Mutual Insurance Company.

LM 000671

4.    Section 3.1 is amended in its entirety to read as follows:

*Section 3.1      Funding*

Notwithstanding anything to the contrary contained herein, participation in the Plan by a Participant and the payment of Plan benefits attributable to Company contributions shall be conditioned on such Participant contributing to the Plan at such time and in such amounts as the Plan Administrator shall establish from time to time ("Participant Contribution").    The Plan Administrator may require that any Participant Contributions be made by payroll deduction.  Nothing herein requires the Company, an Employer, or the Plan Administrator to contribute to or under the Plan, or to maintain any fund or segregate any amount for the benefit of any Participant, except to the extent specifically required under the terms of the SPD attached hereto in Appendix B.  No Participant shall have any right to, or interest in, the assets of the Company or any Employer.

Benefits for this Plan are unfunded and paid from the general assets of the Company.

5.    Article 6 is amended in its entirety to read as follows:

## ARTICLE VI.  AMENDMENT AND TERMINATION

*Section 6.1      Right to Amend*

The Company or the Company's parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, shall have the right to make at any time any amendment or modification to the Plan; but in no event shall any such amendment or modification prejudice any claim or benefit under the Plan which was incurred but not paid prior to the date of the amendment or modification.    The Company or the Company's parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, may delegate to the Chief Executive Officer of the Company the authority to make any plan amendment required to bring the Plan into conformity with law or regulation.

*Section 6.2      Right to Terminate*

The Company or the Company's parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, shall have the right at any time to terminate the Plan in whole or in part; but in no event shall such termination prejudice any claim or benefit under the Plan which was incurred but not paid prior to the termination date.

6.      Section 7.1 is amended in its entirety to read as follows:

*Section 7.1        Plan Administrator*

Liberty Mutual Insurance Company shall be the "Plan Administrator." The Plan Administrator shall have overall responsibility for the administration of this Plan and any decisions made in accordance herewith shall be final and conclusive on all Employees. The Company may change or modify this responsibility in its sole discretion. All usual and reasonable expenses of the Plan Administrator may be paid in whole or in part by the Company and any expenses not paid by the Company shall not be the responsibility of the Plan Administrator.

7.      Section 7.6 is amended its entirety to read as follows:

*Section 7.6        Named Fiduciaries*

The following persons or entities are named as fiduciaries under the Plan:

The Company - The Company, acting through its Board of Directors, a committee thereof, or a delegee of either, has chosen the Plan Administrator to be responsible for all fiduciary functions under the Plan, unless the function is explicitly delegated to another named fiduciary. The Plan Administrator has the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payment of any benefits, and decide any other matters relating to the administration or operation of the Plan. Any such interpretations or decisions of the Plan Administrator shall be conclusive and binding.

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan. Any named fiduciary hereunder may, by resolution of its board of directors or pursuant to such formal procedures as it shall establish, designate persons (including third-party administrators) other than the named fiduciaries to carry out the fiduciary responsibilities under the Plan.

LM 000673

IN WITNESS WHEREOF, Liberty Mutual Insurance Company has caused this Amendment to be executed by its duly authorized officer effective the _24th_ day of September 2003.

LIBERTY MUTUAL INSURANCE COMPANY

By: _____

Christopher C. Mansfield

Senior Vice President and General Counsel


ACCEPTED AND AGREED TO:

LIBERTY MUTUAL GROUP INC.

By: _____

Christopher C. Mansfield

Vice President and General Counsel

DAHMEN v. LIBERTY MUTUAL GROUP, et. al.


No. 2:15-cv-76-SAB


# EXHIBIT B

# LIBERTY MUTUAL
## SHORT-TERM DISABILITY PLAN

Amended and Restated as of January 1, 2001

**Liberty Mutual Insurance Company**

# LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

## Table of Contents

ARTICLE I. PREAMBLE ........................................................................................1

Section 1.1 The Plan. ...........................................................................................1

Section 1.2 Purpose and Intent. ...........................................................................1

Section 1.3 Definitions. ........................................................................................1

Section 1.4 Interpretation. ....................................................................................2

ARTICLE II. ELIGIBILITY AND PARTICIPATION ...........................................3

Section 2.1 Eligibility. .........................................................................................3

Section 2.2 Enrollment. ........................................................................................3

Section 2.3 Termination of Participation. ............................................................3

ARTICLE III. FUNDING .......................................................................................3

Section 3.1 Funding. ............................................................................................3

ARTICLE IV. BENEFITS ......................................................................................4

Section 4.1 Benefits. ............................................................................................4

ARTICLE V. CLAIMS ...........................................................................................4

Section 5.1 Claims Procedure. .............................................................................4

Section 5.2 Exhaustion of Administrative Remedies. .........................................6

Section 5.3 Action for Recovery. .........................................................................5

Section 5.4 Participant's Responsibilities. ...........................................................5

ARTICLE VI. AMENDMENT AND TERMINATION. .........................................6

Section 6.1 Right to Amend. .................................................................................6

Section 6.2 Right to Terminate. ...........................................................................6

ARTICLE VII. ADMINISTRATION AND FIDUCIARY PROVISIONS ...............6

Section 7.1 Plan Administrator. ...........................................................................6

Section 7.2 Powers and Duties of the Plan Administrator. ..................................7

Section 7.3 Outside Assistance and Payment of Expenses. ................................8

Section 7.4 Delegation of Powers. .......................................................................8

Section 7.5 Indemnification of Fiduciaries and Plan Administrator. ..................8

Section 7.6 Named Fiduciaries. ...........................................................................8

Section 7.7 Complete and Separate Allocation of Fiduciary Responsibilities. ................................9

Section 7.8 Disclaimer of Liability. ................................9

**ARTICLE VIII.  EMPLOYERS** ................................10

Section 8.1 Adoption of Plan. ................................10

Section 8.2 Administration. ................................11

Section 8.3 Termination of Participation. ................................9

**ARTICLE IX.  MISCELLANEOUS** ................................10

Section 9.1 Exclusive Benefit. ................................10

Section 9.2 Non-Alienation of Benefits. ................................10

Section 9.3 Limitation of Rights. ................................11

Section 9.4  Governing Laws and Jurisdiction and Venue. ................................10

Section 9.5 Severability. ................................10

Section 9.6 Construction. ................................10

Section 9.7 Expenses. ................................11

Section 9.8  Entire Plan ................................12

Section 9.9 Other Law ................................12

**APPENDIX A** ................................12

**APPENDIX B** ................................13

# LIBERTY MUTUAL
## SHORT-TERM DISABILITY PLAN

### ARTICLE I.  PREAMBLE

*Section 1.1    The Plan.*

Liberty Mutual Insurance Company (the "Company") established the Liberty Mutual Short-Term Disability Plan (the "Plan") effective January 1, 1992.  The Plan is hereby amended and restated as of January 1, 2001.

*Section 1.2    Purpose and Intent.*

The purpose of the Plan is to provide to Participants short-term disability benefits.

The Plan is intended to meet all applicable requirements of the Internal Revenue Code ("Code") and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as well as rulings and regulations issued or promulgated thereunder.  Nothing in the Plan shall be construed as requiring compliance with Code or ERISA provisions that do not otherwise apply.

*Section 1.3    Definitions.*

The following terms, where capitalized, shall have the meanings set forth below unless otherwise specified herein:

(a)      "Code" means the Internal Revenue Code of 1986, as amended.

(b)      "Company" means Liberty Mutual Insurance Company, a mutual insurance company organized under the laws of Massachusetts.  In the event of the reorganization, merger or similar transaction affecting the Company, any successor entity may adopt the Plan for the benefit of employees of such successor, in which event, the Plan shall continue without any gap or lapse in coverage.

(c)      "Effective Date" of the Plan as amended and restated is January 1, 2001.

(d)      "Employee" means any individual employed on the U.S. payroll by the Company, or by subsidiaries of the Company that participate in the Plan, on a regular full time basis, or regular part-time basis (if scheduled and regularly working 20 hours or more per week).  Individuals classified as independent contractors or leased employees are not eligible for coverage, even if they are later reclassified as common law employees for tax purposes.

(e)      "Employer" means the Company, and subsidiaries of the Company that

1

LM 000678

participate in the Plan.  The Company shall have the right to terminate any Employer's adoption of the Plan at any time.  If an Employer merges or is otherwise consolidated with any affiliate, the successor shall, as to the group of Employees covered by the Plan immediately before such merger or consolidation, be the Employer as defined hereunder, unless the Company specifies to the contrary.  In case of any other merger or consolidation, the successor shall not be the Employer except to the extent that it acts to adopt the Plan.  Each Employer is identified in Appendix A.  The Company shall amend Appendix A as needed, to reflect an Employer's adoption of the Plan or withdrawal from the Plan, without any need to otherwise amend the Plan.

(f)    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(g)    "Participant" means an Employee who meets the requirements for eligibility as set forth in Article II and who properly enrolls in the Plan.

(h)    "Participant Contribution" means the pre-tax or after-tax contribution required to be paid by a Participant, if any, as determined under the SPD, as may be amended from time to time, and which is attached hereto in Appendix B.  The term "Participant Contribution" includes contributions used to purchase insurance contracts or policies.

(i)    "Plan" means the Liberty Mutual Short-Term Disability Plan which consists of this document and the SPD, by reference, as may be amended hereunder, and the SPD incorporated Appendix B hereto as Appendix B. from time to time, and which is attached hereto as A

(k)    "Plan Administrator" means the Company.

(l)    "Plan Year" means each twelve (12) consecutive month January 1 and ending on December 31.

(m)    "SPD" means any summary plan description, as may be summary of material modifications, or other employee describes the benefits under the Plan, and which has be as part of this Plan under Appendix B.

*Section 1.4    Interpretation.*

The Plan shall consist of the articles and appendices of this Plan document and the SPD, as may be amended from time to time, and which is attached hereto as Appendix B. If, as to any provisions of the SPD, the articles of this Plan document provide explicitly to the contrary, the provisions of this Plan document shall control. If there is a conflict between the provisions of any

2

of the articles of this Plan document and the SPD, and such conflict involves a provision required by ERISA or the Code, the provision required by ERISA or the Code shall control. The terms of this Plan document may not enlarge the rights of a Participant to benefits available under the Plan.

## ARTICLE II. ELIGIBILITY AND PARTICIPATION

*Section 2.1      Eligibility.*

An Employee shall be eligible to participate in the Plan as provided under the terms of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

*Section 2.2      Enrollment.*

The Plan Administrator may establish procedures in accordance with the SPD, as may be amended from time to time, for the enrollment of Employees under the Plan. The Plan Administrator may prescribe enrollment forms that must be completed by a prescribed deadline prior to commencement of coverage under the Plan.

*Section 2.3      Termination of Participation.*

A Participant will cease being a Participant in the Plan and coverage under this Plan for the Participant and shall terminate in accordance with the provisions of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

## ARTICLE III. FUNDING

*Section 3.1      Funding.*

Notwithstanding anything to the contrary contained herein, participation in the Plan by a Participant and the payment of Plan benefits attributable to Company or Employer contributions shall be conditioned on such Participant contributing to the Plan at such time and in such amounts as the Plan Administrator shall establish from time to time ("Participant Contribution"). The Plan Administrator may require that any Participant Contributions be made by payroll deduction. Nothing herein requires the Company, an Employer, or the Plan Administrator to contribute to or under the Plan, or to maintain any fund or segregate any amount for the benefit of any Participant, except to the extent specifically required under the terms of the SPD attached hereto in Appendix B. No Participant shall have any right to, or interest in, the assets of the Company or any Employer.

Benefits for this Plan are unfunded and paid from the general assets of the Company.

3

LM 000680

## ARTICLE IV.  BENEFITS

*Section 4.1      Benefits.*

Benefits will be paid solely under the terms of, and in the form and amount specified in, the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

## ARTICLE V.  CLAIMS

*Section 5.1      Claims Procedure.*

(a)     Except as provided in Subsection (b), a claim for benefits shall be submitted to the claims administrator under the terms of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.  A claim shall not be treated as having been filed until all information necessary to process the claim is submitted.  In the event that a claim, as originally submitted, is not complete, the claims administrator shall notify the claimant and the claimant shall then have the responsibility for providing the missing information.  If all information necessary to process a claim is not submitted by the applicable claim filing deadline, the claim shall automatically be deemed to be denied.

(b)     In the event that (i) the SPD does not prescribe a claims procedure for benefits that satisfies the requirements of Section 503 of ERISA, the claims procedure described below shall apply.

(1)     A claim shall be filed in writing and decided within ninety (90) days by the claims administrator unless special circumstances require an extension of up to ninety (90) additional days.  Written notice of the decision on such claim shall be furnished promptly to the claimant and shall be written in a manner calculated to be understood by the claimant.  If the claim is wholly or partially denied, such written notice shall:

(A)     set forth an explanation of the specific findings and conclusions on which such denial is based, making reference to the pertinent provisions of the Plan documents;

(B)     describe any additional information or material needed to support the claim and explain why such information or material, if any, is necessary; and

(C)     describe the claims review procedures in subsections (2) and (3).

(2)     In the event a claim for benefits is denied, or if the claimant has had no response to such claim within ninety (90) days of its submission (in which

4

LM 000681

case the claim for benefits shall be deemed to have been denied) the claimant or his duly authorized representative may request a review by the Plan Administrator of such decision denying the claim.

(A)   Any such request must be filed in writing within sixty (60) days after receipt by the claimant of written notice of the decision or the date such claim is deemed to be denied. Such written request for review shall contain all additional information which the claimant wishes to be considered.

(B)   In pursuing this review, the claimant or his duly authorized representative:

(i)   must request in writing a review of the denial;

(ii)   may review pertinent documents; and

(iii)   may submit issues and comments in writing.

(3)   Written notice of the decision on review shall be furnished to the claimant within sixty (60) days (unless special circumstances require an extension of up to sixty (60) additional days) following the receipt of the request for review. The written notice of the decision shall include specific reasons for the decision and shall refer to the pertinent provisions of the Plan on which the decision is based. If the decision on review is not furnished within the time specified above, the claim shall be deemed to be denied on review.

## Section 5.2   Exhaustion of Administrative Remedies.

No action at law or in equity may be brought to recover under this Plan until all administrative remedies have been exhausted. If a claimant fails to file a timely claim or, if a claim is denied, fails to request a review in accordance with the procedures outlined herein, such claimant shall have no rights of review and shall have no right to bring any action in any court. The denial of the claim shall become final and binding on all persons for all purposes.

## Section 5.3   Action for Recovery.

No action at law or in equity may be brought for recovery under this Plan until the date on which the Participant has exhausted all appeal rights, nor more than one year after the time written proof of claim is required to be furnished.

## Section 5.4   Participant's Responsibilities.

Each Participant shall be responsible for providing the Plan Administrator and/or the Company with the Participant's current address. Any notices required or permitted to be given hereunder

5

LM 000682

shall be deemed given if directed to such address and mailed by regular United States mail. Neither the Plan Administrator nor the Company shall have any obligation or duty to locate a Participant.

## ARTICLE VI.  AMENDMENT AND TERMINATION

### Section 6.1    Right to Amend.

The Board of Directors of the Company, a committee thereof, or a delegee of either, shall have the right to make at any time any amendment or modification to the Plan; but in no event shall any such amendment or modification prejudice any claim or benefit under the Plan which was incurred but not paid prior to the date of the amendment or modification. The Board of Directors has delegated to the Chief Executive Officer of the Company the authority to make any plan amendment required to bring the Plan into conformity with law or regulation.

### Section 6.2    Right to Terminate.

The Board of Directors of the Company, a committee thereof, or a delegee of either, shall have the right at any time to terminate the Plan in whole or in part; but in no event shall such termination prejudice any claim or benefit under the Plan which was incurred but not paid prior to the termination date.

## ARTICLE VII.  ADMINISTRATION AND FIDUCIARY PROVISIONS

### Section 7.1    Plan Administrator.

The Company shall be the "Plan Administrator." The Plan Administrator shall have overall responsibility for the administration of this Plan and any decisions made in accordance herewith shall be final and conclusive on all Employees. The Company may change or modify this responsibility in its sole discretion. All usual and reasonable expenses of the Plan Administrator may be paid in whole or in part by the Company and any expenses not paid by the Company shall not be the responsibility of the Plan Administrator.

### Section 7.2    Powers and Duties of the Plan Administrator.

The Plan Administrator, and its designees as it relates to functions designated by the Plan Administrator, shall have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following:

    (a)    to have complete and final discretionary authority to construe and interpret the Plan, control over the operation and administration of the Plan, including interpretation of all Plan documents, decisions concerning all questions of eligibility to participate

6

LM 000683

and the determination of the amount, manner and time of payment of any benefits hereunder. Without limitation, such decisions by the Plan Administrator and its designees as to the determination of all related or non-related questions and matters that arise under the Plan shall be final and conclusive, and there shall be no *de novo* review of any such decisions by any court. Any review of such decisions shall be limited to determining whether the decisions were so arbitrary and capricious as to be an abuse of discretion;

(b)    to have control over the operation and procedures of the Plan, including prescribing procedures to be followed by Participants filing claims for benefits;

(c)    to prepare and distribute, in such manner as the Plan Administrator and its designees determine to be appropriate, information explaining the Plan;

(d)    to receive from the Employer and from Participants such information as shall be necessary for the proper administration of the Plan;

(e)    to furnish the Employer, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate;

(f)    to receive, review and keep on file (as it deems necessary) reports of benefit payments by the Employer and reports of disbursements for expenses directed by the Plan Administrator;

(g)    to exercise such authority and responsibility as it deems appropriate in order to comply with the terms of the Plan relating to the records of the Participants and the balances which are payable under this Plan; and

(h)    to appoint individuals to assist in the administration of the Plan and any other agents it deems advisable, including legal counsel, consultants and actuaries.

The Plan Administrator and its designees may rely upon any reasonable direction, or information from a Participant relating to such Participant's entitlement to benefits hereunder as being proper under this Plan, and are not required under this Plan to inquire into the propriety of any such direction or information. It is intended under this Plan that the Plan Administrator and its designees shall be responsible for the proper exercise of their own powers, duties, responsibilities and obligations under this Plan and shall not be responsible for any act or failure to act of the Employer. Neither the Plan Administrator nor the Employer make any guarantee to any Participant in any manner for any loss or other event because of the Participant's participation in this Plan.

*Section 7.3    Outside Assistance and Payment of Expenses.*

(a)    Outside Assistance:   The Plan Administrator may employ such counsel, accountants, claims administrators, consultants, actuaries and other person or persons as it shall deem advisable.

7

LM 000684

(b)    Payment of Expenses:  The Plan Administrator has the right to pay any Plan expenses out of existing Plan funds which in the Plan Administrator's discretion are allowable expenses under ERISA.

## Section 7.4    Delegation of Powers.

In accordance with the provisions hereof, the Plan Administrator has been delegated certain administrative functions relating to the Plan with all powers necessary to enable it properly to carry out such duties.

## Section 7.5    Indemnification of NonCorporate Fiduciaries and Plan Administrator.

In case the Plan Administrator or noncorporate fiduciaries of the Plan who are affiliated with the Company or an Employer as a director or officer of the Company or an Employer are involved in litigation related to the Plan, or a judgment is rendered against such parties, the Company, acting through its Board of Directors, a committee thereof, or a delegee of either, shall indemnify the Plan Administrator or such noncorporate fiduciaries who are affiliated with the Company or an Employer as a director or officer of the Company or an Employer for any action taken in good faith in the administration of the Plan or in compliance with the requirements of the Plan.

## Section 7.6    Named Fiduciaries.

The following persons or entities are named as fiduciaries under the Plan:

(a)    The Company - The Company, acting through its Board of Directors, a committee thereof, or a delegee of either, has chosen the Plan Administrator to be responsible for all fiduciary functions under the Plan, unless the function is explicitly delegated to another named fiduciary. The Plan Administrator has the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payment of any benefits and decide any other matters relating to the administration or operation of the Plan. Any such interpretations or decisions of the Plan Administrator shall be conclusive and binding.

(b)    Other Named Fiduciaries:

(1)    The Employer, or Employers, acting through their board of directors, shall be responsible for the funding of the Plan; provided, that the Plan's funding policy and method shall be determined by the Company.

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.  Any named fiduciary hereunder may, by resolution of its board of directors or pursuant to such formal procedures as it shall establish, designate persons (including third-party administrators) other than the named fiduciaries to carry out the fiduciary responsibilities under the Plan.

8

### Section 7.7   *Complete and Separate Allocation of Fiduciary Responsibilities.*

It is intended that this Article VII shall allocate to each named fiduciary the individual responsibility for the prudent execution of the functions assigned to each named fiduciary. The performance of such responsibilities shall be deemed a several assignment and not a joint assignment. None of such responsibilities nor any other responsibility is intended to be shared by two (2) or more of such fiduciaries, unless such sharing shall be provided by a specific provision of the Plan or any agreement of trust. Whenever one named fiduciary is required by the Plan to follow the directions of another, the two shall not be deemed to have been assigned a shared responsibility, but the responsibility of the one giving the direction shall be deemed to be its sole responsibility, and the responsibility of the one receiving such direction shall be to follow it insofar as such direction is on its face proper under the Plan and applicable law.

### Section 7.8   *Disclaimer of Liability.*

Except as otherwise provided under sections 404 through 409 of ERISA, neither the Board of Directors of the Company, the Employer, the board of directors of the Employer, the trustee (if any), the Plan Administrator, nor any person designated to carry out fiduciary responsibilities pursuant to this Plan shall be liable for any act, or failure to act, which is made in good faith pursuant to the provisions of the Plan.

## ARTICLE VIII.  EMPLOYERS

### Section 8.1   *Adoption of Plan.*

This Plan may be adopted by an Employer, provided that such adoption is with the approval of the Company. Such adoption shall be by resolution of the Employer's governing body, a copy of which shall be filed with the Company.

### Section 8.2   *Administration.*

As a condition to adopting the Plan, and except as otherwise provided herein, each Employer shall be deemed to have authorized the Plan Administrator to act for it in all matters arising under or with respect to the Plan and shall comply with such other terms and conditions as may be imposed by the Plan Administrator.

### Section 8.3   *Termination of Participation.*

Each Employer may cease to participate in the Plan with respect to its Employees or Former Employees by resolution of its governing body, provided the Employer is authorized to do so by the Company, by formal written resolutions of the Company's Board of Directors (or the person, entity or group of persons appointed by the Board of Directors by action taken in accordance with its authority).

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 73

LM 000686

## ARTICLE IX. MISCELLANEOUS

### Section 9.1      Exclusive Benefit.

This Plan has been established for the exclusive benefit of Participants and except as otherwise provided herein, all contributions under the Plan may be used only for such purpose.

### Section 9.2      Non-Alienation of Benefits.

No benefit, right or interest of any Participant under the Plan shall be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, seizure, attachment or legal, equitable or other process, or be liable for, or subject to, the debts, liabilities or other obligations of such person, except as otherwise required by law or, in the case of assignments, as permitted under the terms of the Plan. The Employer shall not be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of any Participant entitled to benefits hereunder.

### Section 9.3      Limitation of Rights.

Neither the establishment nor the existence of the Plan, nor any modification thereof, shall operate or be construed so as to:

(a)     give any person any legal or equitable right against the Plan (including any assets of the Plan) the Company or an Employer, except as expressly provided herein or required by law; or

(b)     create a contract of employment with any Employee, obligate the Company or an Employer to continue the service of any Employee, or affect or modify the terms of an Employee's employment in any way, including the right of the Company or an Employer to discharge any Employee, with or without cause.

### Section 9.4      Governing Laws.

The Plan shall be construed and enforced according to the laws of the state of Massachusetts, to the extent not preempted by Federal law that shall otherwise control.

### Section 9.5      Severability.

If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability shall not affect any other provision of the Plan, and the Plan shall be construed and enforced as if such invalid or unenforceable provision had not been included herein.

### Section 9.6      Construction.

The captions contained herein are inserted only as a matter of convenience and for reference, and in no way define, limit, enlarge or describe the scope or intent of the Plan, nor in any way shall affect

10

LM 000687

the Plan or the construction of any provision thereof.  Any terms expressed in the singular form shall be construed as though they also include the plural, where applicable, and references to the masculine, feminine, and the neuter are interchangeable.

*Section 9.7     Expenses.*

Any expenses incurred in the administration of the Plan shall be paid by the Plan, by the Company and/or by one or more Employers, according to the Company's determination.

*Section 9.8     Entire Plan.*

This document constitutes the entire Plan and there are no oral items or conditions to the contrary. Any change, modification or amendment to the Plan must be in writing.

*Section 9.9     Other Law*

The Plan shall comply with all other state and federal law to the extent not preempted by ERISA and to the extent such laws require compliance by the Plan.


IN WITNESS WHEREOF, the Company has caused this Plan to be effective January 1, 2001, except as otherwise stated herein, to be executed by its duly authorized officer.

LIBERTY MUTUAL INSURANCE COMPANY

By: *Helen ER Sayles*

Title: *SVP - HR & Administration*

11

LM 000688

# LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

## APPENDIX A

In addition to **Liberty Mutual Insurance Company**, the following Employers have adopted the Plan pursuant to Section 8.1:

Colorado Casualty Insurance Company
Golden Eagle Insurance Corporation
Helmsman Management Services, Inc.
Liberty Insurance Holdings, Inc.
Liberty International Agency, Inc.
Liberty Mutual Fire Insurance Company
Liberty Life Assurance Company of Boston
Liberty Northwest Insurance Corporation
National Insurance Association
Summit Consulting, Inc.
The Netherlands Insurance Company
Wausau Service Corporation
Workwell Health & Safety, Inc.

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 76

LM 000689

LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

APPENDIX B

The following documents shall form a part of the Plan pursuant to Section 1.3 herein:

- Summary Plan Description for the Liberty Mutual Short-Term Disability Plan.

13

LM 000690

DAHMEN v. LIBERTY MUTUAL GROUP, et. al.

No. 2:15-cv-76-SAB

# EXHIBIT C

AMENDMENT TO
LIBERTY MUTUAL SHORT TERM DISABILITY PLAN

WHEREAS, the Compensation Committee of the Board of Directors of Liberty Mutual
Holding Company Inc. passed a resolution dated November 12, 2008, amending the
Liberty Mutual Short Term Disability Plan (the "Plan");

NOW THEREFORE, the Plan effective as of January 1, 2009, is amended as follows:

1. Section 5.1(a) is amended by adding the following provision at the beginning of the
paragraph:

All claims by participants, beneficiaries, and others based on a purported failure to follow
the Plan's terms, including but not limited to an alleged failure to follow any
direction from a participant pursuant to Plan terms, an alleged administrative error or
omission, or other alleged misconduct, are subject to the Plan's claims procedures.

2. Section 6.1 is amended in its entirety as follows:

*Section 6.1    Right to Amend*

The Company or its parent or ultimate parent company, through their respective boards of
directors or a committee of one of those boards, shall have the right at any time to: (i)
amend or modify the Plan; but in no event shall any such amendment or modification
prejudice any claim or benefit under the Plan which was incurred but not paid prior to the
amendment or modification; and (ii) delegate to the Chief Executive Officer of the
Company the authority (a) to make any plan amendment required to bring the Plan into
conformity with law or regulation; and (b) to amend the Plan provided such amendments
are not considered material because the financial exposure to either the Plan or to the Plan
Sponsor is not material and there is no change in the participants' benefits or any change
is immaterial and/or the change is to the administrative provisions of the Plan, such as
claims processes or allocation of responsibilities for administering various aspects of the
Plan.

IN WITNESS WHEREOF, Liberty Mutual Group Inc. has caused this
Amendment to be executed by its duly authorized officer effective January 1, 2009.

LIBERTY MUTUAL GROUP INC.

By: *Helen Ek Sayles*

LIBERTY MUTUAL INSURANCE COMPANY
AMENDMENT TO
LIBERTY MUTUAL SHORT TERM DISABILITY PLAN

WHEREAS, the Board of Directors of Liberty Mutual Insurance Company passed a resolution on September 10, 2003 which: (a) authorized an amendment of the Liberty Mutual Short Term Disability Plan ("Plan") so that, except as noted below, all references to "Liberty Mutual Insurance Company" would become references to "Liberty Mutual Group Inc.", (b) upon acceptance by Liberty Mutual Group Inc., transfers sponsorship of the Plan from Liberty Mutual Insurance Company to Liberty Mutual Group Inc., including the responsibility to fund the Plan, and (c) adopted the Plan as a Participating Employer;

WHEREAS, the Board of Directors of Liberty Mutual Group Inc. passed a resolution on September 10, 2003 which: (a) accepted the transfer of sponsorship of the Plan, (b) adopted the Plan as amended, (c) assumed all liabilities with respect to the Plan, (d) approved Liberty Mutual Insurance Company as a Participating Employer in the Plan, and (e) appointed Liberty Mutual Insurance Company as Plan Administrator;

NOW THEREFORE, effective as of September 24, 2003, the Plan is amended as follows:

1.    Section 1.1 is amended in its entirety to read as follows:

*Section 1.1        The Plan*

Liberty Mutual Insurance Company established the Liberty Mutual Short Term Disability Plan (the "Plan") effective January 1, 1992. The Plan was amended and restated as of January 1, 2001.

On September 10, 2003, the respective Boards of Directors of Liberty Mutual Insurance Company and Liberty Mutual Group Inc. passed resolutions effecting a transfer in the sponsorship of the Plan from Liberty Mutual Insurance Company to Liberty Mutual Group Inc., so that effective September 24, 2003, Liberty Mutual Group Inc. became the Plan Sponsor, and Liberty Mutual Insurance Company became a Participating Employer in the Plan and the Plan Administrator. In addition, in connection with such transfer, Liberty Mutual Group Inc. assumed all liabilities with respect to the Plan.

2.    Section 1.3(b) is amended in its entirety to read as follows:

(b)    "Company" means Liberty Mutual Group Inc. In the event of the reorganization, merger or similar transaction affecting the Company, any successor entity may adopt the Plan for the benefit of employees of such successor, in which event the Plan shall continue without any gap or lapse in coverage.

3.    Section 1.3(l) is amended in its entirety to read as follows:

(l)    "Plan Administrator" means  Liberty Mutual Insurance Company.

4.    Section 3.1 is amended in its entirety to read as follows:

*Section 3.1      Funding*

Notwithstanding anything to the contrary contained herein, participation in the Plan by a Participant and the payment of Plan benefits attributable to Company contributions shall be conditioned on such Participant contributing to the Plan at such time and in such amounts as the Plan Administrator shall establish from time to time ("Participant Contribution").    The Plan Administrator may require that any Participant Contributions be made by payroll deduction.  Nothing herein requires the Company, an Employer, or the Plan Administrator to contribute to or under the Plan, or to maintain any fund or segregate any amount for the benefit of any Participant, except to the extent specifically required under the terms of the SPD attached hereto in Appendix B.  No Participant shall have any right to, or interest in, the assets of the Company or any Employer.

Benefits for this Plan are unfunded and paid from the general assets of the Company.

5.    Article 6 is amended in its entirety to read as follows:

## ARTICLE VI. AMENDMENT AND TERMINATION

*Section 6.1      Right to Amend*

The Company or the Company's parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, shall have the right to make at any time any amendment or modification to the Plan; but in no event shall any such amendment or modification prejudice any claim or benefit under the Plan which was incurred but not paid prior to the date of the amendment or modification.    The Company or the Company's parent or ultimate parent company, through their respective boards of directors or a committee of one of those boards, may delegate to the Chief Executive Officer of the Company the authority to make any plan amendment required to bring the Plan into conformity with law or regulation.

*Section 6.2      Right to Terminate.*

The Company or the Company's parent or ultimate parent company, through their shall have the respective boards of directors or a committee of one of those boards, ... ent shall such right at any time to terminate the Plan in whole or in part; but in no ev... urred but not termination prejudice any claim or benefit under the Plan which was inc... paid prior to the termination date.

LM 000672

6.    Section 7.1 is amended in its entirety to read as follows:

*Section 7.1      Plan Administrator*

Liberty Mutual Insurance Company shall be the "Plan Administrator." The Plan Administrator shall have overall responsibility for the administration of this Plan and any decisions made in accordance herewith shall be final and conclusive on all Employees. The Company may change or modify this responsibility in its sole discretion. All usual and reasonable expenses of the Plan Administrator may be paid in whole or in part by the Company and any expenses not paid by the Company shall not be the responsibility of the Plan Administrator.

7.    Section 7.6 is amended its entirety to read as follows:

*Section 7.6      Named Fiduciaries*

The following persons or entities are named as fiduciaries under the Plan:

The Company - The Company, acting through its Board of Directors, a committee thereof, or a delegee of either, has chosen the Plan Administrator to be responsible for all fiduciary functions under the Plan, unless the function is explicitly delegated to another named fiduciary. The Plan Administrator has the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payment of any benefits, and decide any other matters relating to the administration or operation of the Plan. Any such interpretations or decisions of the Plan Administrator shall be conclusive and binding.

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan. Any named fiduciary hereunder may, by resolution of its board of directors or pursuant to such formal procedures as it shall establish, designate persons (including third-party administrators) other than the named fiduciaries to carry out the fiduciary responsibilities under the Plan.

IN WITNESS WHEREOF, Liberty Mutual Insurance Company has caused this Amendment to be executed by its duly authorized officer effective the _24th_ day of September 2003.

LIBERTY MUTUAL INSURANCE COMPANY

By: _____

Christopher C. Mansfield
Senior Vice President and General Counsel


ACCEPTED AND AGREED TO:

LIBERTY MUTUAL GROUP INC.

By: _____

Christopher C. Mansfield
Vice President and General Counsel

LM 000674

# LIBERTY MUTUAL
# SHORT-TERM DISABILITY PLAN

Amended and Restated as of January 1, 2001

**Liberty Mutual Insurance Company**

# LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

## Table of Contents

ARTICLE I.  PREAMBLE .................................................................................................1

Section 1.1 The Plan. ...................................................................................................1

Section 1.2 Purpose and Intent. ....................................................................................1

Section 1.3 Definitions. ................................................................................................1

Section 1.4 Interpretation. ............................................................................................2

ARTICLE II.  ELIGIBILITY AND PARTICIPATION ..................................................3

Section 2.1 Eligibility. .................................................................................................3

Section 2.2 Enrollment. ................................................................................................3

Section 2.3 Termination of Participation. .....................................................................3

ARTICLE III.  FUNDING ................................................................................................3

Section 3.1 Funding. .....................................................................................................3

ARTICLE IV.  BENEFITS ...............................................................................................4

Section 4.1 Benefits. .....................................................................................................4

ARTICLE V.  CLAIMS ....................................................................................................4

Section 5.1 Claims Procedure. ......................................................................................4

Section 5.2 Exhaustion of Administrative Remedies. ...................................................6

Section 5.3 Action for Recovery. .................................................................................5

Section 5.4 Participant's Responsibilities. ....................................................................5

ARTICLE VI.  AMENDMENT AND TERMINATION ...................................................6

Section 6.1 Right to Amend. .........................................................................................6

Section 6.2 Right to Terminate. ....................................................................................6

ARTICLE VII.  ADMINISTRATION AND FIDUCIARY PROVISIONS .....................6

Section 7.1 Plan Administrator. ....................................................................................6

Section 7.2 Powers and Duties of the Plan Administrator. ...........................................7

Section 7.3 Outside Assistance and Payment of Expenses. ..........................................8

Section 7.4 Delegation of Powers. ...............................................................................8

Section 7.5 Indemnification of Fiduciaries and Plan Administrator. .............................8

Section 7.6 Named Fiduciaries. ....................................................................................8

Section 7.7 Complete and Separate Allocation of Fiduciary Responsibilities. ...................................9

Section 7.8 Disclaimer of Liability.................................................................................9

**ARTICLE VIII. EMPLOYERS** ...........................................................................10

Section 8.1 Adoption of Plan.......................................................................................10

Section 8.2 Administration.........................................................................................11

Section 8.3 Termination of Participation. ..............................................................9

**ARTICLE IX. MISCELLANEOUS**...................................................................10

Section 9.1 Exclusive Benefit......................................................................................10

Section 9.2 Non-Alienation of Benefits......................................................................10

Section 9.3 Limitation of Rights.................................................................................11

Section 9.4  Governing Laws and Jurisdiction and Venue. .....................................10

Section 9.5 Severability. ...........................................................................................10

Section 9.6 Construction. ..........................................................................................10

Section 9.7 Expenses. ...............................................................................................11

Section 9.8  Entire Plan.............................................................................................12

Section 9.9 Other Law ..............................................................................................12

**APPENDIX A** ........................................................................................................12

**APPENDIX B** ........................................................................................................13

# LIBERTY MUTUAL
# SHORT-TERM DISABILITY PLAN

## ARTICLE I. PREAMBLE

*Section 1.1      The Plan.*

Liberty Mutual Insurance Company (the "Company") established the Liberty Mutual Short-Term Disability Plan (the "Plan") effective January 1, 1992. The Plan is hereby amended and restated as of January 1, 2001.

*Section 1.2      Purpose and Intent.*

The purpose of the Plan is to provide to Participants short-term disability benefits.

The Plan is intended to meet all applicable requirements of the Internal Revenue Code ("Code") and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as well as rulings and regulations issued or promulgated thereunder. Nothing in the Plan shall be construed as requiring compliance with Code or ERISA provisions that do not otherwise apply.

*Section 1.3      Definitions.*

The following terms, where capitalized, shall have the meanings set forth below unless otherwise specified herein:

    (a)    "Code" means the Internal Revenue Code of 1986, as amended.

    (b)    "Company" means Liberty Mutual Insurance Company, a mutual insurance company organized under the laws of Massachusetts. In the event of the reorganization, merger or similar transaction affecting the Company, any successor entity may adopt the Plan for the benefit of employees of such successor, in which event, the Plan shall continue without any gap or lapse in coverage.

    (c)    "Effective Date" of the Plan as amended and restated is January 1, 2001.

    (d)    "Employee" means any individual employed on the U.S. payroll by the Company, or by subsidiaries of the Company that participate in the Plan, on a regular full time basis, or regular part-time basis (if scheduled and regularly working 20 hours or more per week). Individuals classified as independent contractors or leased employees are not eligible for coverage, even if they are later reclassified as common law employees for tax purposes.

    (e)    "Employer" means the Company, and subsidiaries of the Company that

1

LM 000678

participate in the Plan. The Company shall have the right to terminate any Employer's adoption of the Plan at any time. If an Employer merges or is otherwise consolidated with any affiliate, the successor shall, as to the group of Employees covered by the Plan immediately before such merger or consolidation, be the Employer as defined hereunder, unless the Company specifies to the contrary. In case of any other merger or consolidation, the successor shall not be the Employer except to the extent that it acts to adopt the Plan. Each Employer is identified in Appendix A. The Company shall amend Appendix A as needed, to reflect an Employer's adoption of the Plan or withdrawal from the Plan, without any need to otherwise amend the Plan.

(f)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(g)     "Participant" means an Employee who meets the requirements for eligibility as set forth in Article II and who properly enrolls in the Plan.

(h)     "Participant Contribution" means the pre-tax or after-tax contribution required to be paid by a Participant, if any, as determined under the SPD, as may be amended from time to time, and which is attached hereto in Appendix B. The term "Participant Contribution" includes contributions used to purchase insurance contracts or policies.

(j)     "Plan" means the Liberty Mutual Short-Term Disability Plan, which consists of this document and the SPD incorporated hereunder by reference, as may be amended from time to time, and which is attached hereto as Appendix B.

(k)     "Plan Administrator" means the Company.

(l)     "Plan Year" means each twelve (12) consecutive month period commencing January 1 and ending on December 31.

(m)    "SPD" means any summary plan description, as may be amended from time to time, summary of material modifications, or other employee communication, which describes the benefits under the Plan, and which has been included by the Employer as part of this Plan under Appendix B.

*Section 1.4      Interpretation.*

The Plan shall consist of the articles and appendices of this Plan document and the SPD, as may be amended from time to time, and which is attached hereto as Appendix B. If, as to any provisions of the SPD, the articles of this Plan document provide explicitly to the contrary, the provisions of this Plan document shall control. If there is a conflict between the provisions of any

2

of the articles of this Plan document and the SPD, and such conflict involves a provision required by ERISA or the Code, the provision required by ERISA or the Code shall control. The terms of this Plan document may not enlarge the rights of a Participant to benefits available under the Plan.

## ARTICLE II. ELIGIBILITY AND PARTICIPATION

### Section 2.1    Eligibility.

An Employee shall be eligible to participate in the Plan as provided under the terms of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

### Section 2.2    Enrollment.

The Plan Administrator may establish procedures in accordance with the SPD, as may be amended from time to time, for the enrollment of Employees under the Plan. The Plan Administrator may prescribe enrollment forms that must be completed by a prescribed deadline prior to commencement of coverage under the Plan.

### Section 2.3    Termination of Participation.

A Participant will cease being a Participant in the Plan and coverage under this Plan for the Participant and shall terminate in accordance with the provisions of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

## ARTICLE III. FUNDING

### Section 3.1    Funding.

Notwithstanding anything to the contrary contained herein, participation in the Plan by a Participant and the payment of Plan benefits attributable to Company or Employer contributions shall be conditioned on such Participant contributing to the Plan at such time and in such amounts as the Plan Administrator shall establish from time to time ("Participant Contribution"). The Plan Administrator may require that any Participant Contributions be made by payroll deduction. Nothing herein requires the Company, an Employer, or the Plan Administrator to contribute to or under the Plan, or to maintain any fund or segregate any amount for the benefit of any Participant, except to the extent specifically required under the terms of the SPD attached hereto in Appendix B. No Participant shall have any right to, or interest in, the assets of the Company or any Employer.

Benefits for this Plan are unfunded and paid from the general assets of the Company.

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 89

LM 000680

## ARTICLE IV.  BENEFITS

*Section 4.1       Benefits.*

Benefits will be paid solely under the terms of, and in the form and amount specified in, the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.

## ARTICLE V.  CLAIMS

*Section 5.1       Claims Procedure.*

(a)     Except as provided in Subsection (b), a claim for benefits shall be submitted to the claims administrator under the terms of the SPD, as may be amended from time to time, and which is attached hereto as Appendix B.  A claim shall not be treated as having been filed until all information necessary to process the claim is submitted. In the event that a claim, as originally submitted, is not complete, the claims administrator shall notify the claimant and the claimant shall then have the responsibility for providing the missing information.  If all information necessary to process a claim is not submitted by the applicable claim filing deadline, the claim shall automatically be deemed to be denied.

(b)     In the event that (i) the SPD does not prescribe a claims procedure for benefits that satisfies the requirements of Section 503 of ERISA, the claims procedure described below shall apply.

(1)     A claim shall be filed in writing and decided within ninety (90) days by the claims administrator unless special circumstances require an extension of up to ninety (90) additional days.  Written notice of the decision on such claim shall be furnished promptly to the claimant and shall be written in a manner calculated to be understood by the claimant.  If the claim is wholly or partially denied, such written notice shall:

(A)     set forth an explanation of the specific findings and conclusions on which such denial is based, making reference to the pertinent provisions of the Plan documents;

(B)     describe any additional information or material needed to support the claim and explain why such information or material, if any, is necessary; and

(C)     describe the claims review procedures in subsections (2) and (3).

(2)     In the event a claim for benefits is denied, or if the claimant has had no response to such claim within ninety (90) days of its submission (in which

4

case the claim for benefits shall be deemed to have been denied) the claimant or his duly authorized representative may request a review by the Plan Administrator of such decision denying the claim.

(A) Any such request must be filed in writing within sixty (60) days after receipt by the claimant of written notice of the decision or the date such claim is deemed to be denied. Such written request for review shall contain all additional information which the claimant wishes to be considered.

(B) In pursuing this review, the claimant or his duly authorized representative:

(i) must request in writing a review of the denial;

(ii) may review pertinent documents; and

(iii) may submit issues and comments in writing.

(3) Written notice of the decision on review shall be furnished to the claimant within sixty (60) days (unless special circumstances require an extension of up to sixty (60) additional days) following the receipt of the request for review. The written notice of the decision shall include specific reasons for the decision and shall refer to the pertinent provisions of the Plan on which the decision is based. If the decision on review is not furnished within the time specified above, the claim shall be deemed to be denied on review.

## Section 5.2    Exhaustion of Administrative Remedies.

No action at law or in equity may be brought to recover under this Plan until all administrative remedies have been exhausted. If a claimant fails to file a timely claim or, if a claim is denied, fails to request a review in accordance with the procedures outlined herein, such claimant shall have no rights of review and shall have no right to bring any action in any court. The denial of the claim shall become final and binding on all persons for all purposes.

## Section 5.3    Action for Recovery.

No action at law or in equity may be brought for recovery under this Plan until the date on which the Participant has exhausted all appeal rights, nor more than one year after the time written proof of claim is required to be furnished.

## Section 5.4    Participant's Responsibilities.

Each Participant shall be responsible for providing the Plan Administrator and/or the Company with the Participant's current address. Any notices required or permitted to be given hereunder

5

LM 000682

shall be deemed given if directed to such address and mailed by regular United States mail. Neither the Plan Administrator nor the Company shall have any obligation or duty to locate a Participant.

## ARTICLE VI. AMENDMENT AND TERMINATION

### Section 6.1    Right to Amend.

The Board of Directors of the Company, a committee thereof, or a delegee of either, shall have the right to make at any time any amendment or modification to the Plan; but in no event shall any such amendment or modification prejudice any claim or benefit under the Plan which was incurred but not paid prior to the date of the amendment or modification. The Board of Directors has delegated to the Chief Executive Officer of the Company the authority to make any plan amendment required to bring the Plan into conformity with law or regulation.

### Section 6.2    Right to Terminate.

The Board of Directors of the Company, a committee thereof, or a delegee of either, shall have the right at any time to terminate the Plan in whole or in part; but in no event shall such termination prejudice any claim or benefit under the Plan which was incurred but not paid prior to the termination date.

## ARTICLE VII. ADMINISTRATION AND FIDUCIARY PROVISIONS

### Section 7.1    Plan Administrator.

The Company shall be the "Plan Administrator." The Plan Administrator shall have overall responsibility for the administration of this Plan and any decisions made in accordance herewith shall be final and conclusive on all Employees. The Company may change or modify this responsibility in its sole discretion. All usual and reasonable expenses of the Plan Administrator may be paid in whole or in part by the Company and any expenses not paid by the Company shall not be the responsibility of the Plan Administrator.

### Section 7.2    Powers and Duties of the Plan Administrator.

The Plan Administrator, and its designees as it relates to functions designated by the Plan Administrator, shall have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following:

    (a)    to have complete and final discretionary authority to construe and interpret the Plan, control over the operation and administration of the Plan, including interpretation of all Plan documents, decisions concerning all questions of eligibility to participate

6

LM 000683

and the determination of the amount, manner and time of payment of any benefits hereunder.  Without limitation, such decisions by the Plan Administrator and its designees as to the determination of all related or non-related questions and matters that arise under the Plan shall be final and conclusive, and there shall be no *de novo* review of any such decisions by any court.  Any review of such decisions shall be limited to determining whether the decisions were so arbitrary and capricious as to be an abuse of discretion;

(b)    to have control over the operation and procedures of the Plan, including prescribing procedures to be followed by Participants filing claims for benefits;

(c)    to prepare and distribute, in such manner as the Plan Administrator and its designees determine to be appropriate, information explaining the Plan;

(d)    to receive from the Employer and from Participants such information as shall be necessary for the proper administration of the Plan;

(e)    to furnish the Employer, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate;

(f)    to receive, review and keep on file (as it deems necessary) reports of benefit payments by the Employer and reports of disbursements for expenses directed by the Plan Administrator;

(g)    to exercise such authority and responsibility as it deems appropriate in order to comply with the terms of the Plan relating to the records of the Participants and the balances which are payable under this Plan; and

(h)    to appoint individuals to assist in the administration of the Plan and any other agents it deems advisable, including legal counsel, consultants and actuaries.

The Plan Administrator and its designees may rely upon any reasonable direction, or information from a Participant relating to such Participant's entitlement to benefits hereunder as being proper under this Plan, and are not required under this Plan to inquire into the propriety of any such direction or information.  It is intended under this Plan that the Plan Administrator and its designees shall be responsible for the proper exercise of their own powers, duties, responsibilities and obligations under this Plan and shall not be responsible for any act or failure to act of the Employer. Neither the Plan Administrator nor the Employer make any guarantee to any Participant in any manner for any loss or other event because of the Participant's participation in this Plan.

*Section 7.3    Outside Assistance and Payment of Expenses.*

(a)    Outside Assistance:    The Plan Administrator may employ such counsel, accountants, claims administrators, consultants, actuaries and other person or persons as it shall deem advisable.

7

(b)    Payment of Expenses:   The Plan Administrator has the right to pay any Plan expenses out of existing Plan funds which in the Plan Administrator's discretion are allowable expenses under ERISA.

## Section 7.4    Delegation of Powers.

In accordance with the provisions hereof, the Plan Administrator has been delegated certain administrative functions relating to the Plan with all powers necessary to enable it properly to carry out such duties.

## Section 7.5    Indemnification of NonCorporate Fiduciaries and Plan Administrator.

In case the Plan Administrator or noncorporate fiduciaries of the Plan who are affiliated with the Company or an Employer as a director or officer of the Company or an Employer are involved in litigation related to the Plan, or a judgment is rendered against such parties, the Company, acting through its Board of Directors, a committee thereof, or a delegee of either, shall indemnify the Plan Administrator or such noncorporate fiduciaries who are affiliated with the Company or an Employer as a director or officer of the Company or an Employer for any action taken in good faith in the administration of the Plan or in compliance with the requirements of the Plan.

## Section 7.6    Named Fiduciaries.

The following persons or entities are named as fiduciaries under the Plan:

(a) The Company - The Company, acting through its Board of Directors, a committee thereof, or a delegee of either, has chosen the Plan Administrator to be responsible for all fiduciary functions under the Plan, unless the function is explicitly delegated to another named fiduciary. The Plan Administrator has the authority, in its sole discretion, to construe the terms of this Plan and decide all questions of eligibility, determine the amount, time and manner of payment of any benefits and decide any other matters relating to the administration or operation of the Plan. Any such interpretations or decisions of the Plan Administrator shall be conclusive and binding.

(b)    Other Named Fiduciaries:

(1)    The Employer, or Employers, acting through their board of directors, shall be responsible for the funding of the Plan; provided, that the Plan's funding policy and method shall be determined by the Company.

Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.  Any named fiduciary hereunder may, by resolution of its board of directors or pursuant to such formal procedures as it shall establish, designate persons (including third-party administrators) other than the named fiduciaries to carry out the fiduciary responsibilities under the Plan.

8

LM 000685

### Section 7.7    Complete and Separate Allocation of Fiduciary Responsibilities.

It is intended that this Article VII shall allocate to each named fiduciary the individual responsibility for the prudent execution of the functions assigned to each named fiduciary. The performance of such responsibilities shall be deemed a several assignment and not a joint assignment. None of such responsibilities nor any other responsibility is intended to be shared by two (2) or more of such fiduciaries, unless such sharing shall be provided by a specific provision of the Plan or any agreement of trust. Whenever one named fiduciary is required by the Plan to follow the directions of another, the two shall not be deemed to have been assigned a shared responsibility, but the responsibility of the one giving the direction shall be deemed to be its sole responsibility, and the responsibility of the one receiving such direction shall be to follow it insofar as such direction is on its face proper under the Plan and applicable law.

### Section 7.8    Disclaimer of Liability.

Except as otherwise provided under sections 404 through 409 of ERISA, neither the Board of Directors of the Company, the Employer, the board of directors of the Employer, the trustee (if any), the Plan Administrator, nor any person designated to carry out fiduciary responsibilities pursuant to this Plan shall be liable for any act, or failure to act, which is made in good faith pursuant to the provisions of the Plan.

## ARTICLE VIII. EMPLOYERS

### Section 8.1    Adoption of Plan.

This Plan may be adopted by an Employer, provided that such adoption is with the approval of the Company. Such adoption shall be by resolution of the Employer's governing body, a copy of which shall be filed with the Company.

### Section 8.2    Administration.

As a condition to adopting the Plan, and except as otherwise provided herein, each Employer shall be deemed to have authorized the Plan Administrator to act for it in all matters arising under or with respect to the Plan and shall comply with such other terms and conditions as may be imposed by the Plan Administrator.

### Section 8.3    Termination of Participation.

Each Employer may cease to participate in the Plan with respect to its Employees or Former Employees by resolution of its governing body, provided the Employer is authorized to do so by the Company, by formal written resolutions of the Company's Board of Directors (or the person, entity or group of persons appointed by the Board of Directors by action taken in accordance with its authority).

9

## ARTICLE IX.  MISCELLANEOUS

### Section 9.1    Exclusive Benefit.

This Plan has been established for the exclusive benefit of Participants and except as otherwise provided herein, all contributions under the Plan may be used only for such purpose.

### Section 9.2    Non-Alienation of Benefits.

No benefit, right or interest of any Participant under the Plan shall be subject to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, seizure, attachment or legal, equitable or other process, or be liable for, or subject to, the debts, liabilities or other obligations of such person, except as otherwise required by law or, in the case of assignments, as permitted under the terms of the Plan. The Employer shall not be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of any Participant entitled to benefits hereunder.

### Section 9.3    Limitation of Rights.

Neither the establishment nor the existence of the Plan, nor any modification thereof, shall operate or be construed so as to:

  (a)  give any person any legal or equitable right against the Plan (including any assets of the Plan) the Company or an Employer, except as expressly provided herein or required by law; or

  (b)  create a contract of employment with any Employee, obligate the Company or an Employer to continue the service of any Employee, or affect or modify the terms of an Employee's employment in any way, including the right of the Company or an Employer to discharge any Employee, with or without cause.

### Section 9.4    Governing Laws.

The Plan shall be construed and enforced according to the laws of the state of Massachusetts, to the extent not preempted by Federal law that shall otherwise control.

### Section 9.5    Severability.

If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability shall not affect any other provision of the Plan, and the Plan shall be construed and enforced as if such invalid or unenforceable provision had not been included herein.

### Section 9.6    Construction.

The captions contained herein are inserted only as a matter of convenience and for reference, and in no way define, limit, enlarge or describe the scope or intent of the Plan, nor in any way shall affect

10

LM 000687

the Plan or the construction of any provision thereof. Any terms expressed in the singular form shall be construed as though they also include the plural, where applicable, and references to the masculine, feminine, and the neuter are interchangeable.

*Section 9.7    Expenses.*

Any expenses incurred in the administration of the Plan shall be paid by the Plan, by the Company and/or by one or more Employers, according to the Company's determination.

*Section 9.8    Entire Plan.*

This document constitutes the entire Plan and there are no oral items or conditions to the contrary. Any change, modification or amendment to the Plan must be in writing.

*Section 9.9    Other Law*

The Plan shall comply with all other state and federal law to the extent not preempted by ERISA and to the extent such laws require compliance by the Plan.

IN WITNESS WHEREOF, the Company has caused this Plan to be effective January 1, 2001, except as otherwise stated herein, to be executed by its duly authorized officer.

LIBERTY MUTUAL INSURANCE COMPANY

By: *Helen ER Sayles*

Title: *SVP - HR & Administration*

11

LM 000688

## LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

### APPENDIX A

In addition to **Liberty Mutual Insurance Company**, the following Employers have adopted the Plan pursuant to Section 8.1:

Colorado Casualty Insurance Company
Golden Eagle Insurance Corporation
Helmsman Management Services, Inc.
Liberty Insurance Holdings, Inc.
Liberty International Agency, Inc.
Liberty Mutual Fire Insurance Company
Liberty Life Assurance Company of Boston
Liberty Northwest Insurance Corporation
National Insurance Association
Summit Consulting, Inc.
The Netherlands Insurance Company
Wausau Service Corporation
Workwell Health & Safety, Inc.

PLAINTIFF'S MOTION AND BRIEF IN SUPPORT
OF SECOND AMENDED COMPLAINT - 98

LM 000689

LIBERTY MUTUAL SHORT-TERM DISABILITY PLAN

APPENDIX B

The following documents shall form a part of the Plan pursuant to Section 1.3 herein:

- Summary Plan Description for the Liberty Mutual Short-Term Disability Plan.

13

DAHMEN v. LIBERTY MUTUAL GROUP, et. al.


No. 2:15-cv-76-SAB


# EXHIBIT D